799 So.2d 105 (2001)
Alfred HUGHERY, Jr, Appellant,
v.
STATE of Mississippi, Appellee.
No. 2000-KA-01453-COA.
Court of Appeals of Mississippi.
July 31, 2001.
Rehearing Denied October 30, 2001.
*106 David L. Walker, Batesville, Attorney for Appellant.
Office of the Attorney General By W. Glenn Watts, Jackson, Attorney for Appellee.
BEFORE SOUTHWICK, P.J., THOMAS, AND IRVING, JJ.
THOMAS, J., for the Court:
¶ 1. Alfred Hughery, Jr. was convicted of two counts of uttering a forgery and sentenced to two four year terms in the custody of the Mississippi Department of Corrections to be served consecutively. Aggrieved, Hughery asserts the following errors on appeal:
I. THE TRIAL COURT ERRED IN FAILING TO GRANT HUGHERY'S MOTION FOR A MISTRIAL FOR FAILING TO DISCLOSE INFORMATION INVOLVING A PHOTOGRAPH LINE-UP IN DISCOVERY OR DUE TO THE SUGGESTIVE NATURE OF THE PHOTOGRAPH LINE-UP.
II. THE EVIDENCE WAS NOT SUFFICIENT TO SUPPORT *107 THE DENIAL OF A DIRECTED VERDICT.
Finding no error, we affirm.

FACTS
¶ 2. Alfred Hughery, Jr. was hired by Donna Traywick to paint her day care building located at 110 Thomas Street, Batesville, Mississippi. Hughery painted in the evenings and on the weekends so that the children would not be exposed to the paint fumes. He was given a key to the building so that he would have access during these odd hours. Traywick paid Hughery with checks from her business account. Hughery saw Traywick write the checks and knew where she kept her checkbook in the office of the day care building. Traywick wrote the last check to Hughery around March 17, 1998.
¶ 3. In late May, or early June, Traywick was contacted by her bank concerning a series of checks that had placed her business account in overdraft. When she checked her bank statements, she discovered checks written to people that she did not know. Traywick did not authorize or sign any of these checks. The signature (in Traywick's name) was not her signature. One of these unauthorized checks was written to "Jessie Jones" for $200. Another one of these unauthorized checks was written to "Donald Ware" for $250.
¶ 4. After contacting the police, Traywick met Hughery at the Batesville Police Department. At that time, Hughery told her that he was sorry for taking some five or six checks from her check book. He further offered to work for her in order to pay the money back.
¶ 5. Mr. Ezell Pigues, the store manager for Piggly Wiggly in Sardis, Mississippi, testified that he cashed one of these unauthorized checks for two hundred dollars. He identified Hughery, who he had known for a long time, as the person for whom he cashed the check. Pigues testified that although the check was endorsed by "Jessie Jones," he did not make Hughery sign the check as well because he had known Hughery for such a long time and trusted him.
¶ 6. The testimony of Patsy Keating, owner of Medicap Pharmacy in Batesville, is a crucial part of this case. Therefore, we quote her testimony from the record in its entirety.
PATSY KEATING, upon being called to testify as a witness on behalf of the State, after having been first duly sworn, testified as follows:
DIRECT EXAMINATION
BY MR. KELLY:
Q. What is your name, please?
A. Patsy Keating.
Q. And what type of business do you own?
A. I own Medicap Pharmacy.
Q. Where is that located?
A. 110 Highway 51 North, Batesville.
Q. How long has that business been in operation?
A. Since March of '94.
Q. Were you open and operating under that business name during the month of May 1998?
A. Yes, sir.
Q. I have handed you a check which is marked as Exhibit No. 2. Are you able to identify that document?
A. Yes, sir.
Q. And how are you able to make that identification?
A. This is the check that I took in May from this individual for some purchases that he made, and we gave him the rest in cash.

*108 Q. Can you identify or recognize the person who, in fact, presented that check at your business?
A. Yes, sir.
Q. Where is that person seated?
A. By Mr. Walker.
Q. Could you describe what he's wearing, please, ma'am.
A. He has the long sleeved shirt with white collar and cuffs.
Q. Now, did he present this check to you for cashing?
A. Yes, sir.
Q. And where was that?
A. At Medicap Pharmacy.
Q. In Batesville?
A. Yes, sir.
Q. And did you, in fact, cash the check?
A. Yes, sir.
Q. Do you know his real name?
A. I know now.
Q. You know now. Back in May of 1998 did you know his name?
A. No, sir, I did not.
Q. Okay. Ms. Keating, who is out the $250?
A. I am.
MR. KELLY: I tender the witness.
CROSS-EXAMINATION BY MR. WALKER:
Q. Ms. Keating, have you ever known this man prior to May of 1998?
A. Not to my knowledge, no, sir.
Q. Had you ever seen him prior to that date?
A. I can't say that I have never seen him, but I don't remember seeing him.
Q. Were you shown any photographic lineup of individuals who theoretically could have cashed this check by the Batesville Police Department?
A. Yes, sir.
Q. You were?
A. Yes, sir.
Q. Were you able to pick anybody out?
A. I picked him out.
Q. Does Mr. Kelly know about all of this?
A. Yes, sir, I suppose he does. I'm sure he does.
MR. WALKER: I'd like to request a brief recess, Your Honor, to maybe deal with a 4.06 matter, what use to be a 4.06 matter.
THE COURT: Can you finish this witness?
MR. WALKER: I don't know, Your Honor. Just to speak plainly
THE COURT: Let's just take a short recess and let me cover this point with the lawyers. You may go in the jury room.
(THE FOLLOWING PROCEEDINGS TOOK PLACE IN OPEN COURT OUTSIDE THE PRESENCE OF THE JURY. THE DEFENDANT WAS PRESENT WITH HIS ATTORNEY.)
MR. WALKER: The bottom line, so to speak, is to the best of my knowledge I was not provided any photographic lineup material by the State in the discovery. I stand to be corrected by Mr. Kelly, but my file does not reflect that. Of course, Ms. Keating said she was shown a photographic lineup at the police department. That's not in discovery, not the version I have. We simply claim a discovery violation, Your Honor, pursuant to the Uniform Circuit and County Rule 9.04.
THE COURT: Mr. Kelly, I haven't found it thumbing through the file. Do you have any independent recollection of whether that was included or was it an oversight or do you know?

*109 MR. KELLY: No, sir, I'm afraid I can't answer you at this point. I'm trying to find out.
THE COURT: Mr. Walker, for the sake of the record and to move on here, what relief are you seeking? It appears, and I've been through most of the file, an awful lot of discovery has been furnished in the case by the prosecutor's office. I have not come up on that particular
MR. WALKER: Your Honor, I would move for a mistrial because, you know, the heart of this case is identification. There's no forensic scientist coming as far as I know. This lady is telling the jury she's identified him, and she's telling me she identified him at a photographic lineup. If I'd known about it prior to the trial, I most likely would have filed a suppression motion. We think we show harm here to justify a mistrial especially when the heart of the case is identification. I think we've impeached Mr. Pigues to some degree. You know, we need this other material in order to try to impeach Ms. Keating here.
THE COURT: Maybe I ought to hear the argument in chambers.
(THE FOLLOWING PROCEEDINGS TOOK PLACE IN CHAMBERS OUTSIDE THE PRESENCE OF THE JURY. THE DEFENDANT WAS NOT PRESENT WITH HIS ATTORNEY.)
MR. WALKER: Your Honor, I'll try again to try to make my theory.
THE COURT: You're saying identification is the heart of this case. I mean he's already been identified by Ms. Traywick and Mr. Pigues. I don't remember exactly what questions about identification were asked this lady. I'm not sure if she's relying solely on her Mr. Kelly may develop that further for me. Even if the lineup is somewhat tainted by not being disclosed, I can't see where you can say this womanthe failure to furnish you with this information is a technical violation since you've requested discovery. You've got to go a little further in this case. I don't think this case is going to hinge solely on her identification of this person.
MR. WALKER: To try to rebut you, Your Honor, now
THE COURT: I'm trying to tell you what I'm grasping for. I'm trying to find out what is the substance other than a technical violation.
MR. WALKER: On the issue of Ms. Traywick, now, she didn't put him committing any crime. You know, she helped the defense to the degree that she testified that she issued six checks to him that were legitimate. Now, Mr. Pigues, of course, he has his live testimony and he read his statement to the jury which to a degree contradicts the live testimony. And now Ms. Keating says she can identify Mr. Hughery when Mr. Kelly asked her to; and then when I get to cross-examine her, I ask her, Were you shown any photographic identification lineups, she says, Yes. She said she identified Mr. Hughery out of the photographic lineup. So the question in my mind is did she utilize the photographic lineup to assist her in her live testimony today. I think it's probably more the Batesville Police Department not disclosing everything to Mr. Kelly. I don't want to put any bad signals on Mr. Kelly. It may be the police department doing him in, so to speak. I think it's disclosable. It will incriminate the defendant for sure. That's why we feel a mistrial is appropriate. I still maintain the identification testimony is the heart of the case with no forensic evidence, no fingerprint expert here, no handwriting expert here. Maybe we need to develop Ms. Keating's testimony *110 further, Your Honor, and get her in here and let me ask her, Did you rely upon
THE COURT: I told her to come in with me. Apparently, she didn't understand me.
(THE WITNESS, MS. KEATING, ENTERED CHAMBERS.)
MR. WALKER: The other thing, Your Honor, is in my 15 years of dealing with Mr. Kelly, if he has this type of data, he discloses it. That's why I say I don't think Mr. Kelly is the problem, but I think for whatever reason the Batesville Police Department didn't provide it to Mr. Kelly.
MR. KELLY: Your Honor, I appreciate the kind words, but that's not true. I knew that Ms. Keating was shown a photographic lineup. I don't remember what year but in 1998, and I knew that she picked him out of a photographic lineup in 1998. The only thing I can say to Your Honor and Mr. Walker is I can't account for the fact that that wasn't disclosed to the defendant. It should have been. I don't deny that. But I can't find in my paperwork where there is anything to indicate to the Court or to the defendant that this witness and other witnesses were shown photographic lineups in the year 1998, but I know and believe that was done. That's a statement of fact to the best of my knowledge. As a matter of law, the Court will have to deal with how you think this violation impinges upon this trial. But there's a case called York v. State which talks about how pretrial lineup identifications can be used, how that can be used for possible impeachment in court; and the way I remember it is whether a person identifies or misidentifies or fails to identify a witness at a pretrial lineup, whether it's photographic or in person, has no bearing on admissibility of the witness's in-court identification.
THE COURT: That is the law, and that's the reason I want it developed further. I don't know whether Ms. Traywick is relying solelywhether it was a suggestive lineup or did she recognize him, without the lineup would she have. That needs to be developed at this point for my benefit. People are shown lineups all the time on people who they already know and can identify from other means and circumstances. It bears a lot on the ruling I'm going to ultimately have to make.
MR. WALKER: I think you called her Ms. Traywick, Your Honor. That's Ms. Keating here.
THE COURT: I'm sorry.
MR. WALKER: That's for the record.
THE COURT: Develop for me just what happened at the police station, Mr. Kelly.
MR. KELLY: In order to do that may I be excused to get my notes?
THE COURT: Yes, sir.
MR. KELLY: Your Honor, as I indicated, I was aware that there had been a photographic identification made by Ms. Keating before trial. I believe that on April 14, 1999, Ms. Keating was asked to come to the Batesville Police Department, and she was shown a photographic spread of six individuals which is now on Your Honor's desk. Ms. Keating on April 14, 1999, identified Individual No. 4 as being the person who, in fact, cashed the check that she has just testified about.
MR. WALKER: Your Honor, because this material was not disclosed, it precluded the defendant from filing a pretrial motion to suppress. I know the Judge feels strongly that those type of motions should be heard prior to the trial. We do our best to honor the Judge's wishes on that. But just for example, Your Honor, if we'd had such a *111 hearing, like they've got date of offense 4/14/99, obviously, that's wrong according to Ms. Traywick. This Jamie Tedford fellow, Your Honor, he was only with the detective bureau just a short period of time. Why he got reassigned or whatever, I don't know. Did he and Ms. Keating have any preidentification discoverynot discovery, but conversations? You know, just various things like that would have been the point of attack. Were they shuffled in in front of this lady? There's various points of attack that could have been raised. I don't think Mr. Kelly argues that this is not discoverable material from what I gather.
MR. KELLY: I concede that.
MR. WALKER: Your Honor, Mr. Hughery is incarcerated. He's doing a ten-year sentence now. He's not going anywhere.
THE COURT: Well, obviously, even if it's a violation of 9.04, it's just to one count; it's not to the other count.
MR. WALKER: If the State would dismiss that count, that would resolve temporarily the problem. You know, Your Honor, in swearing match cases, you know, the defense lawyers, they look for technicalities, motions to file and this certainly would have been one of them. We would ask the Court to apply that Biggers test on that identification.
THE COURT: Do you have anything further to add, Mr. Kelly?
MR. KELLY: Your Honor, I don't understand how the defendant has been harmed.
THE COURT: I don't either.
MR. KELLY: That's my problem.
MR. WALKER: No opportunity to try to suppress this identification.
THE COURT: This is what I was hoping the State would respond to: This is not the only way this defendant has been identified at this point. Maybe it is to this count.
MR. KELLY: Your Honor, if you could withhold your ruling until the State rests, there's going to be more information developed. As I understand it, this witness has identified the defendant as having been the person who cashed Check No. 2 at her business. And as I understand the ruling in York v. State, it doesn't matter whether there was a pretrial photographic identification, whether there was a pretrial in-person lineup, whether she failed to identify the defendant pretrial or whether she did identify the defendant pretrial. She has the right to come into the courtroom and effect an identification or fail to effect an identification no matter what was done before the in-court procedure. And until the defendant is able to demonstrate the defendant in some way was prejudiced now, I'll concede the defendant was surprised, and that's my fault.
THE COURT: I've been referring to it as a technical violation.
MR. KELLY: That's my fault, and I'm responsible for it. But I can't see how he's been prejudiced when Ms. Traywick, the owner of the checks, says they're forgeries; and when the lady who accepted the check says that she did so from this defendant to her detriment because she's out $250. I anticipate there's going to be three statements attributable to the defendant. Number one is, I don't know nothing about them checks; number two is, I had something to do with those checks; and number three is, I know who had something to do with those checks. And it's going to be a jury determination if the defendant was lying the first time, second time, the third time or all the time.

*112 THE COURT: As I said earlier, even on a technical violation, if I aborted the trial, it would only be on Count 3. I'm not going to do anything now. I'm going to let the trial go forward. I'm going to read this York case tonight. I think York does deal more with pretrial identification than it does a discovery violation.
MR. KELLY: Yes, sir.
THE COURT: If I'm not mistaken, just because a discovery violation occurred doesn't necessarily mean that the trial can't go forward or a mistrial is warranted. Had you ever seen this man before he passed this check to you?
WITNESS KEATING: To my knowledge, no, I had not done any personal dealings with him that I remember. Now, I'm stupid for having taken the check. I feel stupid for doing it.
THE COURT: Did you remember what he looked like?
WITNESS KEATING: From the identification when he brought that to me, Mr. Tedford brought it to the pharmacy and I looked at it at the pharmacy, I didn't have any trouble picking it out. That was over a year ago that I did that, and I didn't have any trouble picking him out now. Of course, a lot of water has run under the bridge, and I've seen a lot more people since that time and haven't thought about this case until y'all brought it back up to my attention. I tried to forget about my stupid action.
THE COURT: It just jumped out at you when you saw this and picked him out of a lineup of six people?
WITNESS KEATING: Over a year ago, yes, sir, I didn't have any trouble picking him out then.
THE COURT: Does he look pretty much the same today?
WITNESS KEATING: Just a little fatter.
THE COURT: I have your motion on record, Mr. Walker. I'm going to look at it. Like I said, I'm not going to abort this trial on Count 3 right now. Any authority that either side has for me to examine you should bring it with you in the morning.
MR. WALKER: Judge, can we just make a copy of the photo lineup as an exhibit?
THE COURT: Sure.
(SAME RECEIVED AND MARKED AS EXHIBIT NO. 4-ID FOR IDENTIFICATION PURPOSES AND WAS MADE A PART OF THIS RECORD.)
(THE FOLLOWING PROCEEDINGS TOOK PLACE IN OPEN COURT IN THE PRESENCE OF THE JURY. THE DEFENDANT WAS PRESENT WITH HIS ATTORNEY.)
PATSY KEATING, resumed the witness stand and testified further, as follows:
CROSS-EXAMINATION (Resumed) BY MR. WALKER:
Q. Ms. Keating, this photographic lineup that you mentioned, was that demonstrated to you at your place of business?
A. Yes, sir.
Q. And that was by
A. Tedford.
Q. Detective Jamie Tedford?
A. Yes, sir.
Q. All right. And this was how many months after you allegedly took this check?
A. Correct me if I'm wrong, but I believe this was in April of '99, whatever the date was that it was then, and the check was taken right at the end of May of '98, so approximately a year.
Q. How many checks do you typically take during the day, please, ma'am?

*113 A. Well, since I'm the pharmacist, I don't work the register an awful lot, but our pharmacy takes in many checks every day. I might take three one day and thirteen the next.
Q. Under what set of facts and circumstances did you get involved with this check?
A. Well, this was on a Saturday, as I call, and there's not as many employees there on Saturday and our business is not as busy on Saturday, and this was a large check. The other clerk that was there, she was not going to cash the check without some authorization. Since we're so close in our pharmacy, we're right there on top of each other, she and I looked at the check together, and I said, Oh, I'm sure he's done work for yard work for her and she'd be all right, you know. Those were the thoughts that ran through my mind and what I told to Debbie. The check was cashed, and he was out of there, and days later we find out it's not good.
Q. Well, did you ask for any kind of identification from the casher of the check?
A. I probably did not. I just don't remember, to be honest with you. A lot of people when they're cashing a check like that, you don't have to ask; they've already got some identification right there. So the fact that I didn't ask for it doesn't mean that he didn't possibly show something. I'm going to be honest and say I just don't remember.
Q. Did you know Donna Traywick at the time, please, ma'am?
A. Yes, sir.
Q. You had no doubt about Donna Traywick having a checking account?
A. Oh, I knew Donna Traywick for years; that she was somebody that existed, and it wouldn't be any question about her being alive and well.
Q. I know some banks and perhaps businesses nowadays make a person cashing a check put a thumb print on there. Are you familiar with that?
A. No, sir. I get very few bad checks.
Q. How long did you get to view this person who tendered this check to you? two minutes? five minutes? ten minutes?
A. the time he was in the store, is that what you're referring to?
Q. Yes, ma'am.
A. Oh, I don't imagine he was in the store more than five minutes.
Q. Let me try to get this clear in my mind. Who was the clerk on duty that asked you about this check?
A. We were both there together, Debbie Phillips and myself.
Q. Okay. So did she bring it back to where you were working; is that what happened?
A. We were both there at the cash register together.
Q. Both of you were at the cash register together?
A. That's right.
Q. Was there anything that stood out about the person who presented the check to you? I mean was he six foot five? did he weight 300 pounds? any unusual features?
A. He definitely was not six foot five or weigh 300 pounds. He was a small frame person.
Q. Did a person named Eric Broome ever work there?
A. No, sir.
Q. What is the name of your business, please, ma'am?
A. Medicap Pharmacy.
Q. I see. What made the person stand out in your mind, what unusual features? *114 You had to have some way to identify him. What was that, please?
A. Is there something wrong with your memory? I mean does it have to be something unusual about something? I mean you look at six people, and he looks like the one; the other five were not it, and this one appeared to be it. I mean I didn't have to know that any of them were the person.
Q. It's the time lapse that concerns me, all the months that went by between the time you took the check and the time you saw the photographic lineup.
A. Nothing distinguishing any more than he doesn't look like any of the other pictures.
Q. Some of these guys are what we call light skinned, aren't they, some of them are light skinned Afro Americans; isn't that right?
A. Well
Q. Like No. 5 and 6, aren't they light skinned African Americans?
A. According to that picture, but I saw the other picture, the real picture. They are lighter because the others photographed a lot darker.
Q. My question is real simple: Is No. 5 and No. 6 in the photographic lineup, would it be fair to say they're light skinned African Americans?
A. They are definitely lighter skinned African Americans than the other four, yes.
Q. So we can automatically exclude those two because of their skin complexion, can we not?
A. Sure.
Q. So now we're down to four individuals, and two of them have a beard, don't they, No. 2 and 3 have beards?
A. That's right.
Q. Full length beards?
A. That you can see, right.
Q. Now, did the man who tendered the check to you, Ms. Keating, did he have a full length beard that day?
A. That day I'm not going to say he did or did not.
Q. All right. So now we're down to No. 1 and No. 4. If we exclude the two light skinned African Americans and we exclude the two bearded African Americans, we're down to two individuals, aren't we?
A. One and four.
Q. And what is the probability of you picking Alfred Hughery just mathematically, Ms. Keating, if you're down to two?
A. Fifty/fifty. They don't look at all alike.
MR. WALKER: That's all I have, Your Honor.
REDIRECT EXAMINATION BY MR. KELLY:
Q. Ms. Keating, this group of six photographs, is that the same photo group that Mr. Walker just handed to you?
A. Yes, sir.
Q. And is that the same photo group that the Batesville Police Department presented for your inspection on April 14 of 1999?
A. Yes, sir.
MR. KELLY: Your Honor, I offer this as an exhibit.
THE COURT: It can be marked and received.
MR. WALKER: Your Honor, I just object as previously noted.
THE COURT: All right. It can be marked and received into evidence.
(SAME RECEIVED AND MARKED AS EXHIBIT NO. 5 AND WAS MADE A PART OF THIS RECORD.)
BY MR. KELLY:

*115 Q. And today being August 14 of the year 2000 and you having cashed or accepted this check, I believe, on Saturday, either May 29 or 30 in the year 1998, has Mr. Hughery changed in appearance in any way in the last two years?
A. I think he's a little fuller figured, maybe.
Q. Meaning he gained some weight?
A. A little bit, not a lot, but I think maybe a little.
Q. Ma'am, I'm afraid I might have lost track. Where is your business located?
A. 110 Highway 51 North here in Batesville.
Q. And in what county and state is that located?
A. Panola, Mississippi.
Q. Is that in the Batesville court district or the Sardis court district?
A. Batesville.
MR. KELLY: I have no other questions of Ms. Keating, Your Honor. I'd like her to be released but subject to recall.
THE COURT: If you're needed further, you'll be contacted by telephone.
WITNESS EXCUSED.
¶ 7. Lieutenant Paul Shivers testified to having interviewed Hughery after his arrest. After Hughery had been read his Miranda rights, he said that he understood his rights and did not want an attorney present, and volunteered to give a statement. That statement was recorded, offered as State's Exhibit 9, was transcribed and read into the record. That statement read as follows:
I, Alfred Hughery, was working for Donna Traywick at Reaching Rainbows Daycare, Inc., around May of 1998. I had a key to get into the day care because I was doing work on the inside of the building but I had to leave the key in the mailbox because I couldn't take it home with me. One night I was working, my friend, David Smith, came by because I was supposed to be helping his sister move and I told him, I need to paint a little more. So Smith stood around waiting. While I was finishing, Smith seen a checkbook with sheets of checks in it. Smith kept on telling me to get some of the checks, so I did. I went to pull some sheets out of the front, and Smith stopped me and told me to pull them from the middle, so I pulled three sheets from the middle of the checkbook which I think was about nine checks. Smith told me he could write the checks and no one would ever know. Smith also told me he would give me half of the money of what he wrote the checks for. Smith and I that night went to Shell and about two other places and cashed some of the checks. To my knowledge, I was not with Smith when he cashed any more of the checks. Smith also tried to get me to get some more checks, and I wouldn't. I didn't know what Smith wrote the checks for when he cashed them. /signed/ Alfred Hughery, Jr.
¶ 8. At the conclusion of the prosecution's case, Hughery renewed his motion for a mistrial based upon the discovery violation. The prosecution pointed out that Hughery did not follow the Box guidelines, provided as a remedy for discovery violations. Likewise, information about the photo line-up was provided to the jury by Hughery himself, rather than the prosecution. The trial court denied that motion, holding that Hughery had shown no prejudice to his defense as a result of any discovery violation.
¶ 9. Hughery was found guilty of two counts of uttering a forgery and sentenced to two four year consecutive sentences in the custody of the Mississippi Department of Corrections. The two counts were for *116 the check cashed at the Piggly Wiggly and the check cashed at the Medicap.

ANALYSIS

I. DID THE TRIAL COURT ERR IN FAILING TO GRANT HUGHERY'S MOTION FOR A MISTRIAL FOR FAILING TO DISCLOSE INFORMATION INVOLVING A PHOTOGRAPHIC LINE-UP IN DISCOVERY OR DUE TO THE SUGGESTIVE NATURE OF THE PHOTOGRAPH LINE-UP?

STANDARD OF PROOF
¶ 10. In Alexander v. State, 602 So.2d 1180, 1182 (Miss.1992), our supreme court established a standard of proof for cases such as the one at hand.
Case law unequivocally holds that the trial judge "is in the best position for determining the prejudicial effect" of an objectionable comment. See Alexander v. State, 520 So.2d 127, 131 (Miss.1988). Thus, the judge is vested with discretion to determine whether the comment is so prejudicial that a mistrial should be declared. Edmond v. State, 312 So.2d 702, 706 (Miss.1975). Where "serious and irreparable damage" has not resulted, the judge should "cure" or remedy the situation by "admonishing the jury then and there to disregard the impropriety." See also Gray v. State, 549 So.2d 1316, 1320 (Miss.1989).
Id. at 1182.

A. DID THE TRIAL COURT ERR IN FAILING TO GRANT HUGHERY'S MOTION FOR A MISTRIAL FOR THE PROSECUTION'S FAILURE TO DISCLOSE INFORMATION INVOLVING THE PHOTOGRAPHIC LINE-UP?
¶ 11. Rule 9.04(I) of the Uniform Circuit and County Court Rules states the following:
If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
1. Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and
2. If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.
3. The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.
U.C.C.C.R. § 9.04(I).
¶ 12. First of all, the prosecution did not attempt to introduce any information or evidence related to the photographic line-up. Hughery, not the prosecution, attempted to compel testimony in relation to the photographic line-up. In fact, the first mention of the photographic line-up was made by Hughery during cross examination of Keating. Even if the prosecution did attempt to introduce evidence or testimony related to the photographic lineup, Hughery did not follow the proper procedure set out in Rule 9.04(I). If a defendant who has been surprised by undisclosed discoverable evidence does not request a continuance at the time of such surprise, he waives this issue on appeal. *117 Cole v. State, 525 So.2d 365 (Miss.1987); Box v. State, 437 So.2d 19 (Miss.1983). One cannot surprise himself in court.
¶ 13. Had the prosecution introduced or used any information related to the photo identification, Hughery should have first asked for time to review such "surprise" evidence, then asked for a continuance and then if necessary, a mistrial, depending on the impact of the "surprise" evidence immediately after the prosecution attempted to enter such evidence. However, at the time the photographic line-up was mentioned, Hughery made a motion for mistrial rather than a motion for continuance. This assertion of error is procedurally barred.
¶ 14. However, the failure to disclose by the prosecution should not go unmentioned. Information involving the photo identification where Keating successfully picked Hughery out of the photo line-up should have been disclosed to the defense during pre-trial discovery. However, because of the circumstances in the case at hand where the evidence is overwhelming as to Hughery's guilt, the failure to disclose by the prosecution is harmless error. The judge handled this situation as best he could, taking Keating into chambers and allowing her to explain the situation surrounding the photo line-up and finding that she had made a competent identification of Hughery at trial exclusive of the photo line-up.

B. DID THE TRIAL COURT ERR IN FAILING TO GRANT HUGHERY'S MOTION FOR A MISTRAL DUE TO THE SUGGESTIVE NATURE OF THE PHOTOGRAPH LINE-UP?
¶ 15. "If a crime victim identifies a particular suspect in a photographic line-up so constructed that, for any reason, the suspect is singled out or is unreasonably conspicuous, then the identification is deemed tainted and inadmissible." Anderson v. State, 724 So.2d 475, 478 (Miss.Ct.App.1998). The defendant in Anderson claimed that he was singled out during a photo line-up because his photo was the only one taken with a polaroid camera, and, therefore, the only photo with a white border. We reviewed the photos used in that line-up and held that there was no possibility of a very substantial likelihood of irreparable misidentification. Anderson, 724 So.2d at 478. Likewise, in Myles v. State, 774 So.2d 486, 490 (Miss. Ct.App.2000), we found that the fact that the defendant's photo was the only one with a cinder block wall as a background and he was the only light complexioned man shown was not enough to "hold that there was a very substantial likelihood of irreparable misidentification of Walker under the totality of the evidence presented." Myles, 774 So.2d at 490.
¶ 16. In the case at hand, Hughery claims that the photo line-up was unlawfully suggestive due to the facts that he was one of four shown with dark complexions and of those four, one of two who did not have beards. Hughery's contention is not well made or supported. The totality of the circumstances indicate that there was not a very substantial likelihood of irreparable misidentification of Hughery during this photo line-up. Keating, the witness who identified Hughery from a photo lineup, was also able to identify Hughery in court, and accurately recollect seeing him in the Medicap on the day he cashed the unauthorized check.

II. WAS THE EVIDENCE SUFFICIENT TO SUPPORT THE DENIAL OF A DIRECTED VERDICT?
¶ 17. A(1) motion for a directed verdict, (2) request for peremptory instruction, and (3) motion for judgment not *118 withstanding the verdict challenge the legal sufficiency of the evidence. McClain v. State, 625 So.2d 774, 778 (Miss.1993). "Since each requires consideration of the evidence before the court when made, this Court properly reviews the ruling on the last occasion the challenge was made in the trial court." McClain, 625 So.2d at 778. This occurred when the lower court denied the motion for JNOV. Wetz v. State, 503 So.2d 803, 807-8 (Miss.1987). "If there is sufficient evidence to support a verdict of guilty, this Court will not reverse." Meshell v. State, 506 So.2d 989, 990 (Miss.1987). See also Haymond v. State, 478 So.2d 297, 300 (Miss.1985); Fairley v. State, 467 So.2d 894, 902 (Miss. 1985). The test to be applied in considering the sufficiency of the proof based on circumstantial evidence is "whether a rational fact finder might reasonably conclude that the evidence excludes every reasonable hypothesis inconsistent with guilt of the crime charged." Shields v. State, 702 So.2d 380, 382 (Miss.1997) (citing Deloach v. State, 658 So.2d 875, 876 (Miss. 1995)). See also Murphy v. State, 566 So.2d 1201, 1204 (Miss.1990). We hold that the evidence in the case at hand was sufficient to support the verdict. The testimony of Traywick, Pigues, Keating and Shivers as well as the recorded admission of Hughery is sufficient evidence to support the verdict of the trial court. Therefore, we affirm.
¶ 18. THE JUDGMENT OF THE PANOLA COUNTY CIRCUIT COURT OF CONVICTION OF TWO COUNTS OF UTTERING A FORGERY AND SENTENCE OF TWO FOUR YEAR TERMS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS TO RUN CONSECUTIVELY ARE AFFIRMED. COSTS OF APPEAL ARE ASSESSED TO THE PANOLA COUNTY.
McMILLIN, C.J., SOUTHWICK, P.JJ., PAYNE, BRIDGES, LEE, IRVING, MYERS and CHANDLER, JJ., CONCUR. KING, P.J., CONCURS IN RESULT ONLY.