## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-KA-02549-SCT

*STEPHANIE K. STEPHENS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 9/15/2003 |
| TRIAL JUDGE: | HON. JESS H. DICKINSON |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | RAY T. PRICE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: W. GLENN WATTS |
| DISTRICT ATTORNEY: | JOHN MARK WEATHERS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/16/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE SMITH, C.J., EASLEY AND GRAVES, JJ.

### GRAVES, JUSTICE, FOR THE COURT:

¶1.    Stephanie K. Stephens (Stephanie)  was convicted of murdering her husband, Dr. David Stephens, in violation of Section 97-3-19 of the Mississippi Code of 1972.   Following the jury's verdict, the trial judge sentenced Stephanie to life imprisonment in the custody of the Mississippi Department of Corrections. Following the   denial of her post-trial motions, Stephanie timely brings this appeal and asserts numerous errors in the trial below.   Finding no reversible error, we affirm the judgment of the trial court.

### FACTS AND PROCEDURAL HISTORY

¶2.     In 1987, Dr. David Stephens, a prominent heart surgeon, moved to Hattiesburg to establish a cardiovascular program at Forrest General Hospital. Accompanied by his wife, Karen, and two children, David began to establish a new life in Mississippi. However, this new life was not to commence without incident and tragedy.

¶3.     In March 1996, Karen confronted David at their home about an affair David was having with another woman, allegedly Stephanie Kennedy, his nurse. In the heat of their argument, Karen retrieved a pistol, which discharged in her mouth and rendered her immediately paralyzed from the neck down and eventually resulted in her death some two months later. Karen's death was ruled a suicide over David's objection, who wanted it to be ruled an accidental death.

¶4.     Despite demonstrating signs of guilt and depression over Karen's death, David began openly dating Stephanie, and the two were married in 1997. Shortly after his marriage to Stephanie, David suffered a stroke which resulted in hospitalization, missed time from work and a loss of eyesight. To this end, his loss of sight rendered David unable to perform surgical procedures which he had previously performed.

¶5.     In 1998, David began suffering from symptoms of hepatitis C, with which he had been diagnosed years earlier, but previously had been asymptomatic. David was also diagnosed at approximately the same time with diabetes mellitus, the most serious form of diabetes, which caused widespread fluctuations in his blood sugar and attendant complications such as dizziness, blurred vision, difficulty concentrating and confusion. In an attempt to treat and slow the symptoms of his hepatitis C, David underwent two courses of interferon therapy,

which did little to slow the progression of his hepatitis C. Instead, the interferon therapy caused severe damage to David's liver.

¶6. By 2000, David's illnesses had taken their toll and rendered him unable to work. He began to draw disability benefits from his policy with UNUM Insurance Company. David requested that the Hattiesburg Clinic, his previous employer, allow him to continue practicing medicine by reading diagnostic studies, but he was turned down by the Clinic's board of directors for a full-time position and instead was only given part-time work. David's monthly salary dropped form $50,000 to approximately $6,000.

¶7. In addition to David's severe illnesses, by 2001 Stephanie's health also began to deteriorate. She had severe complications from Crohn's disease, an intestinal disorder, and a broken hip which limited her mobility. These conditions rendered Stephanie unable to work. With both David and Stephanie unable to maintain employment, the couple hired a nanny to care for Stephanie's two young children as well as a medical professional to see after them. By this time, David's condition had worsened to the point where he was placed on an organ transplant list at Ochsner Hospital in New Orleans. His diabetes had worsened due to his poor eating and health habits to the point where he wore an insulin pump twenty-four hours a day which automatically injected a regulated amount of insulin into his abdomen at regular intervals.

¶8. On May 1, 2001, Stephanie awoke to find David lying lifeless in his bed. Bobby Shurden, the deputy coroner who investigated the case, spoke with Dr. Philip Rogers, David's treating physician, and concluded that David had died of natural causes as a result of his end-stage liver failure. Initially, neither Dr. Rogers nor Butch Benedict, the Forrest County

Coroner, saw any indication of foul play, other than the possibility that the death may have resulted from a malfunction of the insulin pump. As is customary practice, the Forrest County Coroner's Office drew two vials of blood from David and sent them to the Mississippi Crime Laboratory for analysis. The lab report revealed that a chemical called laudanasine, a metabolite of a hypnotic anesthetic drug called atricurium, was found in the sample of blood drawn from David.

¶9. After receiving the lab report, a full investigation was launched by local law enforcement officials into David's death. On June 1, 2001, Officer Rusty Keyes of the Hattiesburg Police Department, along with Benedict, visited the Stephens home and met with Stephanie regarding the lab report. Stephanie claimed no knowledge of what the drugs were or how they could have gotten into David's system. The Hattiesburg Police Department continued its investigation by subpoenaing phone records, banking information, and David's medical records. On June 25, 2001, Keyes and Benedict received an order from Forrest County Circuit Judge Dickie McKenzie to have David's body exhumed for an autopsy. Dr. Stephen Hayne performed the autopsy which revealed that the cause of death was the "laudanosine overdose and also etomidate toxicity."

¶10. Further, the investigation revealed that David maintained a deferred compensation plan with MetLife Insurance Company which at the time of his death was valued at approximately $732,000. On May 1, 2001 (the day of David's death), MetLife sent out a standard form letter regarding participant renegotiations of pay-out dates to all participants in the Maximum Deferred Compensation program. After failing to receiving correspondence from David,

4

MetLife re-sent the form to his residence on June 1, 2001. On June 14, 2001, MetLife received the form purportedly signed by David and dated April 30, 2001.

¶11. With the above information, the Hattiesburg Police Department obtained an arrest warrant for Stephanie Stephens. During the January 2003 term the Forrest County Grand Jury indicted Stephanie for the murder of her husband in violation of Section 97-3-19 of the Mississippi Code of 1972. Stephanie was arraigned on April 14, 2003, and the trial was set for September 8, 2003.

¶12. Due to enormous pretrial publicity surrounding this case, the trial court granted Stephanie's Motion for Change of Venue, and a jury was selected from DeSoto County. Also, during the pre-trial hearing, the trial court announced that CBS Television wished to cover the courtroom proceedings in hopes of creating a news documentary about this case. Neither counsel for the State nor Stephanie objected to the presence of the media. The trial lasted seven days and involved approximately twenty witnesses and numerous exhibits. On September 15, 2003, Stephanie was found guilty of murder and sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. Having failed on all post-trial motions, Stephanie timely brings this appeal and asserts numerous errors at the trial below.

## DISCUSSION

### I. Cameras in the courtroom.

¶13. Stephanie argues that the trial court violated Rule 4 of the Mississippi Rules of Electronic and Photographic Coverage (MREPC) by allowing media into the courtroom during her trial. Specifically, she argues that the placement of the cameras in the courtroom prejudiced her by infringing upon her right to a fair trial. Also, Stephanie contends that when

5

the trial court advised the jury that the trial was being covered by a national news program, the protection afforded to her by the trial court's order changing venue were reversed. Stephanie avers that these errors resulted in a more tainted jury than could have been obtained originally in Forrest County.

¶14. On June 5, 2003, a pre-trial motion hearing was conducted wherein the trial court addressed several preliminary matters. Among these was the idea of having cameras in the courtroom during the entire trial. Prior to making his ruling, then-Circuit Judge Jess H. Dickinson made the following observations:

> The third thing I want to cover is that I have disclosed previously a contact that was made to the Court through the clerk's office from an executive producer with CBS News. CBS, through its television program "48 Hours," is interested in filming this trial for a subsequent segment on one of their shows. Their reason for making the inquiry is that our Supreme Court recently passed a new rule which allows cameras in the courtroom. And as of the time that this trial will begin, that rule will be in effect. So they made the inquiry stating that they would like to come down and film the trial.
>
> . . . . . . . . . . . . .
>
> I have talked with counsel for Ms. Stephens and with the district attorney about this, but now on the record in open court, I would ask if either of you have any comment to make, any objection, or statement to make to the Court prior to the Court making a determination of whether or not that permission will be granted.

Both counsel for the State and the defendant made no objections to granting CBS access to the courtroom proceedings. The trial judge went on to state, "The Supreme Court has certain requirements attendant to the rule allowing cameras in the courtroom, and those rules are going to be followed. Some of the rules are that the camera cannot film jurors and various other aspects that we will follow."

¶15.    As the trial court correctly points out, on April 17, 2003, this Court adopted the Mississippi Rules for Electronic and Photographic Coverage of Judicial Proceedings (MREPC), bringing Mississippi in accord with those states  which have elected to allow coverage of court proceedings by use of still cameras, television, and other electronic technology.    Prior to passage of the MREPC, cameras were generally excluded from Mississippi courtrooms  under the Mississippi Code of Judicial Conduct.   At present, the MREPC allow for electronic media coverage of public judicial proceedings in appellate and trial courts of record in this state subject to certain conditions.   MREPC 3.   Also, the rules allow the presiding justice or judge with the discretion to limit or terminate electronic coverage at any time during the proceedings if the court deems such necessary and in the interest of justice to protect the rights of the parties or witnesses, or the dignity of the court, or to assure orderly conduct of the proceedings. *Id.*

¶16.    With regard to this particular assignment of error, Stephanie makes two basic contentions.   First, she argues that with the placement of CBS's cameras in the courtroom, the trial court  violated MREPC 4.   Secondly, she avers that when the trial court announced to the jury the trial was being covered by a national news program, any protections previously afforded by the order changing venue were eliminated.

¶17.    Stephanie's first contention is without merit in that the record reveals she never made a contemporaneous objection to allowing CBS into the courtroom during her trial.   There is a general requirement that objections must be raised at the trial level.   We have held that where no contemporaneous objection is made, the alleged error is waived.   ***Scott v. State,*** 878 So.2d 933, 953 (Miss. 2004); ***In re S.A.M.,*** 826 So.2d 1266, 1277 (Miss. 2002); ***In***

7

*re V.R.,* 725 So.2d 241, 245 (Miss. 1998); *Williams v. State,* 684 So.2d 1179, 1203 (Miss. 1996); *Walker v. State,* 671 So.2d 581, 587 (Miss. 1995); *Smith v. State,* 572 So.2d 847, 848 (Miss. 1990); *Cole v. State,* 525 So.2d 365, 368 (Miss. 1988); *Burney v. State,* 515 So.2d 1154, 1156-57 (Miss. 1987). We find no legitimate reason(s) that would exclude application of the contemporaneous objection rule under the present facts. Notwithstanding the current MREPC rules, where no objection is made at the trial level regarding the admission or exclusion of the media as permitted by these rules, such error, if any, is waived on appeal.

¶18. It is, of course, incumbent upon counsel at trial to make a contemporaneous argument and/or objection when he believes an error has occurred. In the instant action, defense counsel had several opportunities to raise objections to the trial court's application of Rule 4. Defense counsel could have raised an objection during the pre-trial hearing when the trial court stated CBS's intention to film the trial, or at any point during the trial if he or his client felt the rules were being violated. However, the record is completely devoid of any such objection.

¶19. Under these circumstances, we have held that a defendant who fails to make a contemporaneous objection must rely on plain error to raise the assignment on appeal. *Perkins v. State,* 863 So.2d 47, 55 (Miss. 2003), *Randall v. State,* 806 So.2d 185, 195 (Miss. 2001); *Whigham v. State,* 611 So.2d 988, 995 (Miss. 1995); *Foster v. State,* 639 So.2d 1263, 1288-99 (Miss. 1994). The plain error doctrine has a two-part test which requires: (i) an error at the trial level and (ii) such an error resulted in a manifest miscarriage of justice. *Gray v. State,* 549 So.2d 1316, 1321 (Miss. 1989). We have held

8

that plain error exists where a defendant's substantive rights have been affected. *Grubb v. State,* 584 So.2d 786, 789 (Miss. 1991).

¶20. Under an analysis of the plain error doctrine, Stephanie must demonstrate an error at the trial level. To this end, Stephanie argues that the placement of CBS's cameras in the courtroom not only violated Rule 4, but severely abrogated her right to a fair trial. She contends that the trial court allowed one camera to be placed immediately behind the jury box on a tall tripod, so that the lens of the camera actually hung over the back rail of the jury box directly above the jurors' heads. She states that a second camera, operated via remote control, was located in a corner between the jury box and the jury room so that it panned the entire jury seated in the box. Lastly, she observed that the third camera was located in the balcony of the courtroom somewhat to the rear of the jury and was not located in a spot which was continually conspicuous to the jury.

¶21. The relevant provisions of Rule 4 are set forth below:

> (a) The location of equipment and personnel necessary for electronic media coverage of judicial proceedings shall be at a place either inside or outside the courtroom so as to be minimally intrusive to the proceedings. Only equipment which does not produce distracting sound or light shall be employed to cover judicial proceedings. No flash or strobe lighting shall be used. All running wires shall be securely taped to the floor. No other artificial lighting device of any kind shall be employed in connection with electronic coverage unless otherwise authorized by the court.

> (b) No members or potential members of the jury may be recorded or shown at any time prior to their dismissal, nor shall the jury selection process be subject to electronic coverage. The presiding judge shall inform all potential jurors at the beginning of the jury selection process of the restrictions of this particular provision.

> . . . . . . . . . .

(e) Electronic media equipment shall not be taken into the courtroom, relocated, or removed from the designated media area except prior to convening of the judicial proceedings, during recess, and after adjournment of the day.

¶22. Stephanie fails to demonstrate how the placement of the cameras was so intrusive as to disrupt the proceedings. The MRECP vest the presiding judge with a wide range of discretion with regard to the location and placement of the media equipment. A review of CBS's footage reveals that the equipment used did not produce any unreasonably distracting sounds or light. All running wires were taped to the floor throughout the trial. The footage did not include the identity of any of the seated jurors nor the jury selection process. In addition to following the MREPC, during the pre-trial hearing, the trial court instituted additional safeguards to insure that Stephanie received a fair and impartial trial. First, the trial court required that all personnel involved in filming the trial would meet with the court and counsel every morning to discuss the day's expected events and any restrictions that might be placed on filming. Second, the trial court mandated that CBS make a copy or provide digital access to the each day's activities available to any other member of the media for use by the media in their news gathering and reporting. Lastly, the trial court placed in its order the stipulation that any party feeling aggrieved by the conduct of CBS or its personnel in making this information available could file a report with the court.

¶23. We note that in circumstances where the media is allowed into judicial proceedings, the location and placement of media equipment could intrude in some manner or fashion upon the intricacies of the proceeding. However, under Rule 4(a), the intrusion must be of

10

a minimal nature. Under the facts before us, we conclude that the presence of the media equipment was not so intrusive that the integrity of the proceeding was compromised.

¶24. Also, with regard to the placement of CBS's cameras, Stephanie fails to set forth any prejudicial effect the placement of the cameras had upon her trial. It is simply not enough to complain that the placement of media equipment in a courtroom proceeding violates the MREPC. The party complaining of a violation must come forward with some evidence to establish (i) that a violation of the rules occurred and (ii) that it prejudiced or impeded their right to a fair and impartial trial. In granting the media access to judicial proceedings, the paramount concern must, of course, be assuring fair trials for the parties. Thus, when a party claims a violation of the MREPC, it is incumbent upon that party to come forward with evidence in support of their claim. Here, Stephanie fails to present such evidence. Thus, we need not reach the second prong of the plain error analysis because Stephanie has failed to establish that a Rule 4 violation occurred.

¶25. The placement of the cameras in the courtroom in the instant action was minimally intrusive to the proceedings and not violative of MREPC Rule 4. Additionally, absent a showing of prejudicial effect, any violation standing alone will not be sufficient to overturn a criminal conviction.

¶26. The second contention raised under this assignment of error is that when the trial court announced to the jury that the trial was being covered by a national news program, any protections previously afforded by the order changing venue were eliminated. This contention is likewise without merit.

¶27.    In considering the appropriateness of a change in venue, this Court looks to the level of pretrial publicity and prejudicial nature of the coverage provided. *Holland v. State,* 705 So.2d 307, 336 (Miss. 1997); *Hickson v. State,* 707 So.2d 536, 542 (Miss. 1997); *Fisher v. State,* 481 So.2d 203, 215 (Miss. 1985).   However, we are not called upon to consider whether the order changing venue was proper.   Instead, we must determine whether the trial court's announcement of media coverage to the jury eliminated the protections afforded by the order changing venue.

¶28.    Due to the enormous pretrial publicity given to this case, the trial court determined that Stephanie's motion for change of venue was meritorious.   In fact, the State, being aware of the extent of the publicity, agreed with the motion.   To this end, the trial court along with counsel empaneled a jury of DeSoto County residents.   Thus, the protections of the order changing venue arose when the jury was selected.    However, Stephanie contends that by allowing the media inside the courtroom, the  protections afforded by the order changing venue were undermined.  This reasoning is flawed for two significant reasons.

¶29.    First, the record reveals that the jury was sequestered throughout the duration of the trial.   It was determined during voir dire that these jurors could be fair and impartial during the trial of this defendant.   There is no reasonable justification to attack the jury's findings because of their knowledge that the trial was being filmed.   Stephanie offers no support to suggest that this jury would have reached a different result but for the presence of the media.   Second, the CBS footage was not released until after the conclusion of the trial.   At this point, jurors were free to discuss any part of the trial, including their deliberations with the media, family and family.   Therefore, the taint (if any) to the protections afforded via the

12

order changing venue arose after the jury reached its verdict. By this time, the proceedings had concluded and Stephanie's rights preserved.

¶30. We hold that a trial court's decision to allow media coverage of judicial proceedings, pursuant to the MREPC, does not eliminate the protections afforded to a criminal defendant in an order changing venue where the jury was sequestered and the media footage was released after the proceedings had concluded.

## II. Corpus delicti.

¶31. Stephanie argues that the trial court should have granted her motion to dismiss at the conclusion of the State's case-in-chief because of its failure to prove all the essential elements of the crime charged beyond a reasonable doubt. Essentially, Stephanie believes that the State failed to prove that David was actually murdered. Instead, she believes sufficient, credible evidence existed to prove that David committed suicide.

¶32. As Stephanie correctly notes, "[c]orpus delicti is defined as the body or substance of the crime." *Parks v. State,* 884 So.2d 738, 742 (Miss. 2004) (quoting *Cotton v. State,* 675 So.2d 308, 313 (Miss. 1996)). It has two elements which must be proven beyond a reasonable doubt in order to show that a crime has actually been committed. *Parks,* 884 So.2d at 742 (citing *Poole v. State,* 246 Miss. 442, 446, 150 So.2d 429, 431 (1963)). First, it is necessary to prove the existence of a certain act or result forming the basis of a criminal charge. *Id.* Moreover, the State must prove the existence of criminal agency as the cause of this act or result. *Id.* The suspect's identity is not a component of the corpus delicti. *Id.* However, "[e]very element, criminal charge, and criminal agency must be proved beyond a reasonable doubt." *Id.* (citing *Poole,* 246 Miss. at 446, 150 So.2d at 431).

13

¶33. During the trial, Karen Burnett testified for the State. According to her testimony, Burnett and her husband accompanied Stephanie and her then fiancé, Christopher Watts, in June, 2002 to Las Vegas. Burnett and her husband were asked to accompany Stephanie and Watts to witness their wedding which was to take place in Las Vegas. Burnett testified that on the day of Stephanie's wedding, Stephanie told Burnett that David wanted to die and requested that Stephanie help him. Burnett said Stephanie injected him with two sedatives and a heart medication. Stephanie argues that Burnett's testimony, coupled with other circumstantial evidence presented at trial, does not prove the corpus delicti of murder. She reasons that because the State failed to prove corpus delicti, the trial court erred in denying her motion to dismiss.

¶34. We have held that where a defendant confesses to a crime, the confession itself is not sufficient to support a felony conviction unless it is corroborated by independent evidence of the corpus delicti. *Hodge v. State,* 823 So.2d 1162, 1166 (Miss. 2002) (citing *Cotton v. State,* 675 So.2d 308, 314 (Miss. 1996)); *Bullock v. State,* 447 So.2d 1284, 1286 (Miss. 1984). However, where there is a confession, much slighter evidence is required to prove corpus delicti. *Miskelley v. State,* 480 So.2d 1104, 1108 (Miss. 1985) (quoting *Roberts v. State,* 153 Miss. 622, 121 So.2d 279 (1929)). "The corpus delicti need not be established beyond a reasonable doubt but to a probability, and proof coupled with a confession may be considered as establishing the corpus delicti beyond a reasonable doubt." *Miskelley,* 480 So.2d at 1108.

¶35. We hold that when coupled with other evidentiary proof offered by the State, Stephanie's confession to Burnett was sufficient to establish the corpus delicti of murder.

14

The record reveals numerous facts which indicate Stephanie's opportunity, ability, knowledge and motive to commit the crime charged. On the morning of May 1, 2001, Stephanie was alone with David behind a locked bedroom door prior to his death. There was corroborated testimony offered by Lena Suprun, the nanny/housekeeper, that David was snoring at one point during that morning, but approximately an hour later, he was silent. The crime lab report and the autopsy revealed that David died due to the presence of Atricurium and Etomidate in his blood stream. It was established that these drugs are only intended to be used in surgical settings to induce anesthesia. The State established that these drugs were accessible to Stephanie at the Forrest General Hospital where she had previously worked. Further, the State showed that as a nurse, Stephanie possessed knowledge about the drugs, their uses, as well as the workings of David's insulin pump. The pump which David utilized was capable of injecting whatever drug was placed inside the system. Also, the record reveals that when she was initially confronted with the fact that drugs were found in David's body, Stephanie's statements were completely inconsistent with those of a grieving widow. When initially revealed that two vials of blood had been drawn from David's body, Stephanie said, "You drew blood?" When questioned further, she said, "Am I being charged with murder?" The investigators were not making accusations, but merely asking preliminary questions which might aid in their investigation.

¶36. Also, the State offered an affidavit of Larry S. Westfall, the national director of Deferred Compensation for MetLife Insurance Company. In his affidavit, Westfall stated that around the time of his death, David maintained a deferred compensation plan with MetLife Insurance Company valued at approximately $732,000. On May 1, 2001 (the day

of David's death), MetLife sent out a standard form letter regarding participant renegotiations of pay-out dates to all participants in the Maximum Deferred Compensation program. After failing to receiving correspondence from David, MetLife resent the form to his residence on June 1, 2001. On June 14, 2001, MetLife received the form purportedly signed by David and dated April 30, 2001. Also, a copy of the MetLife payout agreement and check were offered into evidence by the State.

¶37. Stephanie would have this Court consider the testimony of her witness, Dr. Gerald O'Brien, a forensic psychiatrist. Dr. O'Brien reviewed David's medical, personal and work history. He concluded that David's personal history and health problems indicated he was definitely a candidate for suicide. Seemingly this testimony would stand to contradict the State's theory that David's death was a homicide.

¶38. Jurors are permitted, and indeed have the duty to resolve the conflicts in the testimony they hear. *Gandy v. State,* 373 So.2d 1042, 1045 (Miss. 1979). Any conflicts in the testimony of witnesses is the province of the jury. *Groseclose v. State,* 440 So.2d 297, 300 (Miss. 1983). Who the jury believes and what conclusions it reaches are solely for its determination. As the reviewing court, we cannot and need not determine with exactitude which witness(es) or what testimony the jury believed or disbelieved in arriving at its verdict. It is enough that the conflicting evidence presented a factual dispute for jury resolution. *Id.* at 300.

¶39. Considering the facts before us, it is transparently clear that the jury found the evidence presented by the State was more credible and/or reliable than that offered by Stephanie. A thorough review of the record reveals that the State adequately established the

16

corpus delicti of murder. Burnett's testimony regarding Stephanie's confession is coupled with ample proof of the commission of the crime. We hold that the State clearly established the corpus delicti of the charged offense to a probability. Thus, the trial court did not err in denying Stephanie's motion to dismiss.

### III. Sufficiency of the Evidence.

¶40. Stephanie contends that the trial court erred in denying her motions for directed verdict and judgment notwithstanding the verdict (J.N.O.V.). Stephanie believes that there was insufficient evidence to support her conviction.

¶41. The standard of review for the denial of a motion for directed verdict and judgment notwithstanding the verdict is the same. *Shelton v. State,* 853 So.2d 117, 1186 (Miss. 2003). A directed verdict and JNOV both challenge the legal sufficiency of the evidence presented at trial. *Id.* The standard is as follows: "this Court considered all of the evidence in the light most favorable to the State and gives the State the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Seeling v. State,* 844 So.2d 439, 443 (Miss. 2003). The Court must reverse and render if the facts, viewed in that light, point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a guilty verdict. *Id.* The Court must affirm, however, when there is substantial evidence in support of the verdict of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions. *Id.*

¶42. Stephanie contends that her conviction was based wholly upon circumstantial evidence, and as such, the evidence was legally insufficient to support her conviction. In support of this argument, Stephanie focuses our attention to *Steele v. State,* 544 So.2d 802

(Miss. 1989). In *Steele,* the defendant was found guilty of capital murder in the death of a 23-month-old infant. *Id.* at 803. The defendant was home alone with the child when she incurred fatal head injuries. *Id.* The medical evidence was susceptible to two interpretations, one of which was that the child fell from her bed and sustained the injuries when her head hit the floor. *Id.* at 805-06. The State's theory was that Steele had inflicted the injuries on the child. *Id.* This Court ruled that the trial court should have granted the defendant's motion for J.N.O.V. because the evidence was insufficient to support the conviction. *Steele* is distinguishable from the facts in the case sub judice because, here, the conviction is not based exclusively upon circumstantial evidence.

¶43. "Circumstantial evidence need not exclude every 'possible doubt,' but only every other 'reasonable' hypothesis of innocence." *Neal v. State,* 805 So.2d 520, 526 (Miss. 2002) (quoting *Tolbert v. State,* 407 So.2d 815, 820 (Miss. 1981). However, we have held that a circumstantial evidence case is one in which there is neither an eyewitness nor a confession to the crime. *Mangum v. State,* 762 So.2d 337, 344 (Miss. 2000). *Steele* provides no support for Stephanie's contention because its facts fail to contain either an eyewitness or a confession to the crime. However, the case sub judice is not solely based upon circumstantial evidence in that the defendant confessed to the crime charged. During the trial, Burnett testified to the following:

> "[Stephanie] told me that [David] had expressed to her that he wanted to die and he asked her to help him. And [Stephanie] told me that she injected him with two sedatives and a heart medication, I believe."

18

Thus, Stephanie's statement to Burnett took this case out of the realm of wholly circumstantial evidence. Burnett's testimony was clearly admissible pursuant to Rule 801(d)(2) of the Mississippi Rules of Evidence, as an admission by a party-opponent. Certainly, Stephanie could have attacked the statement's truth or the veracity of the witness on cross-examination or through witnesses of her own. However, the weight afforded to Burnett's testimony was an issue solely for the jury. In addition to Burnett's testimony, the State offered testimony from several witnesses which established that Stephanie possessed the motive, opportunity, ability and knowledge to have committed this crime.

¶44. Considering the evidence offered by the State, Stephanie's argument that the trial court erred in denying her motions for directed verdict and J.N.O.V. is unpersuasive. When observed in the light most favorable to the State and with the State receiving the benefit of all favorable inferences, we conclude that the evidence presented was legally sufficient to support the conviction in this case.

### IV. Karen Burnett's testimony.

¶45. Stephanie avers that the Burnett's testimony concerning the confession should have been stricken and given no credibility whatsoever.

¶46. The standard of review this Court employs regarding admission or exclusion of evidence is an abuse of discretion. *Clark v. State,* 891 So.2d 136, 139 (Miss. 2004); *Parks v. State,* 884 So.2d 738, 742 (Miss. 2004); *Herring v. Poirrier,* 797 So.2d 797, 804 (Miss. 2000). "The trial judge is empowered with the discretion to consider and to decide what evidence is admissible, and unless this judicial discretion is so abused as to be prejudicial to the accused, then, the ruling of the lower court must be affirmed." *Poirrier,* 797 So.2d

at 804.  Where error involves the admission or exclusion of evidence, this Court "will not reverse unless the error adversely affects a substantial right of a party." ***Ladnier v. State,*** 878 So.2d 926, 933  (Miss. 2004) (quoting ***Whitten v. Cox,*** 799 So.2d 1, 13 (Miss. 2000)).

¶47.    Stephanie maintains   that Burnett had a motive to fabricate her trial testimony. According to Burnett's testimony, she and her husband accompanied Stephanie and Watts to Las Vegas in June, 2002 to witness the marriage of Stephanie and Watts.  According to Burnett, on the day of Stephanie's wedding, Stephanie confessed to having injected David with two toxins.  Following the wedding, Burnett, upset with her husband, returned to Hattiesburg and agreed to take care of Stephanie's  home.  Sometime shortly thereafter, Burnett contends that the home was burglarized.

¶48.    When Burnett returned to Hattiesburg, she did not report the confession to law enforcement officials, including her father who worked as an investigator for the Forrest County District Attorney's Office.  Burnett came forward with the confession only when contacted by Officer   Rusty Keyes with the Hattiesburg Police Department concerning the burglary.  The evidence at trial revealed that on July 3, 2002,  Burnett rented a storage unit in which the items taken from Stephanie's home were recovered in August, 2002.  Although both she and Officer Keyes claimed there was no quid pro quo for her testimony, Burnett was never charged with the burglary.

¶49.    During her motion for directed verdict, Stephanie argued before the trial court that Burnett's testimony should have been stricken due to her motive to fabricate the confession. After questioning defense counsel about the motion to exclude Burnett's testimony, the trial court denied it.  The court based its decision upon the following premises.  First, Stephanie

20

believed that Burnett was the burglar that broke into her home.  Next, she contended that this crime gave Burnett the motive to lie.  Finally, Stephanie contended  believed that Burnett was offered a deal by law enforcement officials to testify against her.  The trial court found no evidence to support any of these premises.  Further, even if these premises were all true, the trial court found that there was no evidentiary basis for excluding Burnett's testimony from the jury.

¶50.    The record reveals that Burnett was neither a felon nor charged with a felony at the time of her testimony.  Further, she testified without contradiction or impeachment about the statement made to her by Stephanie.  Burnett was cross-examined about this admission and other related matters, including her personal life, boyfriends, and the burglary.  She denied having burglarized Stephanie's house as well as having made any deals with the State in exchange for her testimony.  The trial court ruled that Burnett's testimony was a matter for the jury to consider.

¶51.    We hold that the trial court did not abuse its discretion in allowing the jury to consider the testimony of Burnett.  As the trial court correctly pointed out, Burnett had personal knowledge of the events upon which her testimony was based.  Also, her testimony was relevant to the issue of whether Stephanie committed the murder.  The jury was furnished with the task of weighing this testimony along with that of all the other witnesses.  We find no error in allowing the jury to hear Burnett's testimony.

### V.    Circumstantial evidence instruction.

¶52. The trial court in this case refused the circumstantial evidence instruction offered by Stephanie. Stephanie contends that by doing so, the trial court committed error. Proposed Instruction D-7 was submitted to the trial court as follows:

> So long as it is reasonably possible or probable to account for the evidence on any reasonable theory or hypothesis consistent with her innocence, the defendant, Stephanie Stephens, must be acquitted by the jury voting not guilty, however strongly you believe her to be guilty.

¶53. The trial court ruled that Stephanie's confession to Burnett raised the proof to more than circumstantial evidence. Upon this backdrop, the court reasoned that granting a circumstantial evidence instruction would have been improper. We agree. For the reasons set forth supra, this assignment of error is completely without merit.

### VI. Identity of a confidential informant.

¶54. During pretrial motion hearings, the court considered defense counsel's request to disclose the identity of a confidential informant. During the hearing, Officer Keyes testified that he discovered Burnett was a suspect in the burglary of Stephanie's home through a confidential informant. This information prompted defense counsel to request disclosure of the informant's identity. At the hearing, Keyes testified that the person was not a confidential informant in the usual sense, but merely a friend of Keyes who had come to him with information he had overheard in a conversation. According to Keyes, the witness overheard a conversation which revealed that Burnett had broken into Stephanie's home and taken items. This, in turn, apparently led Keyes to speak to Burnett and learn of Stephanie's confession while in Las Vegas.

¶55. Stephanie argues that Officer Keyes should have been compelled to disclose the identity of the "confidential informant" so that a further investigation might be conducted by defense counsel to prove with more certainty that Burnett in fact had been involved in the burglary, giving her a motive to implicate Stephanie and testify as to a confession which never occurred. Essentially, Stephanie claims that the State withheld exculpatory material in violation of which held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In determining whether a *Brady* violation has occurred, and thus a new trial is mandated, this Court applies the four-part *Brady* test adopted in *King v. State,* 656 So.2d 1168, 1174 (Miss. 1995), under which the defendant must prove:

i.   that the State possessed evidence favorable to the defendant (including impeachment evidence);

ii.  that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence;

iii. that the prosecution suppressed the favorable evidence; and

iv.  that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*Id. See also Carr v. State,* 873 So.2d 991, 999 (Miss. 2004). The United States Supreme Court has since held that not all failures to disclose exculpatory evidence constitute reversible error. Rather, the question is whether there is a "reasonable probability" that the verdict would have been different but for governmental evidentiary suppression which "undermines confidence in the outcome of the trial." *Kyles v. Whitley,* 514 U.S. 419, 434,

23

115 S.Ct 1555, 131 L.Ed.2d 490 (1995) (citing *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).

¶56.    We need only reach the first prong of the *Brady* analysis to determine that this particular assignment of error is without merit.   To prevail under *Brady,* the defendant must show that the State possessed favorable evidence to the defendant.    The record does not establish   that this informant was a witness to the crime for which   Stephanie was tried. Further, there was no evidence that he or she was a witness to the crime which Stephanie suspects Burnett committed.    Also, the informant was never a witness for the prosecution at any proceeding in the instant action.    Additionally, the trial court interviewed the informant    and discovered that the informant received information from overhearing a conversation between two people the informant did not know.    The trial court determined that the informant's identity was not relevant to any issues regarding whether Stephanie Stephens had committed the crime charged.  M.R.E. 401   states, "'Relevant Evidence' means evidence having any tendency to making the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."   Evidence which is not relevant is not admissible.   M.R.E. 402.   There was no indication that the identity of the informant was relevant to the issues presented in the instant action.

¶57.    Further,  Rule 9.04 B2 of the Uniform Rules of Circuit and County Court Practice (URCCC) provides:

> Disclosure of an informant's identity shall not be required unless the confidential informant is to be produced at a hearing or trial or a failure to disclose his/her identity will infringe the constitutional rights of the accused

or unless the informant was or depicts himself/herself as an eyewitness to the events or event constituting the charge against the defendant.

*Id*. We note that none of the conditions requiring disclosure as set forth in URCCC 9.04 B2 were met in the case sub judice. Thus, considering the facts before us, we hold that the trial court was correct in refusing to disclose the identity of the informant.

## CONCLUSION

¶58. Finding no reversible error in any of the issues raised by Stephanie K. Stephens, we affirm the judgment of the Forrest County Circuit Court.

¶59. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**SMITH, C.J., WALLER, P.J., EASLEY, CARLSON AND RANDOLPH, JJ., CONCUR. COBB, P.J., DIAZ AND DICKINSON, JJ., NOT PARTICIPATING.**