ROBERTS, J.,
 

 for the Court.
 

 ¶ 1. A jury sitting before the Alcorn County Circuit Court found Johnny Steve Parker guilty of murder. The circuit court sentenced Parker to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC). Parker filed an unsuccessful post-trial motion for a judgment notwithstanding the verdict (JNOV) or, alternatively, for a new trial. Aggrieved, Parker appeals and raises four issues. According to Parker, the circuit court erred when it: (1) allowed a witness to testify that Parker threatened to kill her if he caught her with anyone else, (2) denied Parker’s motion for a mistrial regarding a discovery violation, (3) denied Parker’s challenges to the sufficiency of the evidence, and (4) denied Parker’s motion for a new trial. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. The jury’s verdict supports the following version of events. On June 16, 2005, Debbie Dillingham finalized her divorce from Parker. The next day, Debbie had a date with Tim Kingen. Debbie’s half-sister, Brenda Hillis, called Debbie during Debbie’s date with Tim. Brenda was distraught, so Tim and Debbie picked Brenda up. Tim, Debbie, and Brenda rode around, went back to Tim’s house, and socialized until early the next morning. On the following Saturday and Sunday, Tim had some friends over to play cards.
 

 ¶ 3. On Sunday, Parker delivered some of Debbie’s belongings. Parker told Debbie that he had hired a private investigator to follow her. Parker let Debbie know
 
 *704
 
 that he was aware of her date with Tim. In reality, Parker had not hired a private investigator. Instead, Brenda had informed Parker of Debbie’s date with Tim.
 

 ¶ 4. At approximately 9:00 p.m. on Monday, David Michael Strachan and Mary Beth Anderson went to Tim’s house. David stayed at Tim’s house for approximately fifteen to twenty minutes. At approximately the same time, Parker picked up Brenda to “go riding.” During their ride, Brenda told Parker how to find Tim’s house. At approximately 12:45 a.m., Parker and Brenda drove past Tim’s house.
 

 ¶ 5. Debbie was at Tim’s house at that time. Debbie later testified that she and Tim saw a van tap its brake lights in front of Tim’s house. Debbie remembered commenting that Parker was the only person she knew who drove a van. Debbie left Tim’s house around 2:00 a.m.
 

 ¶ 6. At approximately 3:00 a.m., Brenda, who had been dropped off a couple hours earlier, tried to call Parker to check on him. Brenda recounted that Parker appeared very upset when he saw Debbie’s car at Tim’s house. Brenda did not reach Parker, though. Parker’s son, John, answered the phone and informed Brenda that Parker was not at home.
 

 ¶7. Parker finally returned home the next morning. John could not remember the exact time Parker returned, but he estimated that it was sometime between 10:00 a.m. and noon. Parker would not tell John where he had been. Brenda spoke with Parker shortly after 10:00 a.m. According to Brenda, Parker told her that she better not tell anyone that she had showed him where Tim lived.
 

 ¶ 8. John later testified that he and Parker had a conversation that day and that Parker told John that Debbie “was using his car to drive around and f— everybody.” Parker also bragged that he had sex with Brenda. Later, Parker went and retrieved the car that Debbie had been driving. Debbie testified that Parker said “if he caught me with anyone — that he would kill them, that he would kill me, and the very last thing he said to me before he left is, I told you what I would do if I caught you with another man.” Parker again told Debbie that he was aware that she was seeing Tim, and he “told [her] what [he] would do to a man.”
 

 ¶ 9. The following Tuesday night, Tim did not show up for dinner plans with friends. During the remainder of the week, Debbie tried unsuccessfully to contact Tim. On June 25, 2005, Tim’s mother, Janie Kingen, went to Tim’s house. Janie was concerned because she had not been able to get in touch with Tim. Unfortunately, Janie found Tim’s lifeless body. Tim died as the result of a gunshot wound.
 

 ¶ 10. Investigator Michael Beckner of the Alcorn County Sheriffs Department investigated the case. Investigator Beck-ner’s inquiries led to Parker. An Alcorn County grand jury returned an indictment against Parker and charged him with murder. Parker pled not guilty and proceeded to trial. Ultimately, the jury found Parker guilty. Following an unsuccessful post-trial motion for a JNOV or, alternatively, for a new trial, Parker appeals.
 

 ANALYSIS
 

 I. DEBBIE’S TESTIMONY
 

 ¶ 11. Debbie testified that, on Tuesday June 21, 2005, Parker came to her house to retrieve a vehicle that he had been awarded in their divorce. Debbie began to testify that Parker “told [her] that if he ever caught [her] with another man that — .” Before Debbie could finish her statement, Parker’s attorney objected and stated that Parker was “not on trial for anything having to do with her.” According to counsel for Parker, Debbie’s statement was not
 
 *705
 
 relevant. The circuit court conducted a bench conference, but that conference was not transcribed in the record. In any event, the circuit court next reported that Parker’s objection was overruled. Debbie went on to testify that Parker told her “that if he caught [her] with anyone that— that he would kill them, that he would kill [her], and the very last thing he said to [her] before he left is, T told you what I would do if I caught you with another man.’ ”
 

 ¶ 12. Parker raises multiple claims regarding Debbie’s testimony. Many of Parker’s claims are best reserved for Parker’s allegation that the jury’s verdict was contrary to the overwhelming weight of the evidence. However, the crux of Parker’s argument is that the circuit court erred when it allowed the prosecution to submit Debbie’s statement into evidence to demonstrate Parker’s motive or intent to kill Tim because Tim was already dead at the time Parker made the statement at issue. Additionally, Parker argues that his statement was not an admission, but it was instead a “hypothetical statement of future action.”
 

 ¶ 13. As we consider this issue, we are mindful of the appropriate standard of review. “The standard of review regarding the admission or exclusion of evidence is abuse of discretion.”
 
 Terrell v. State,
 
 952 So.2d 998, 1005(¶ 31) (Miss.Ct.App.2006). We will only find an abuse of discretion if “a defendant shows clear prejudice resulting from an undue lack of constraint on the prosecution or undue constraint on the defense.”
 
 Id.
 
 In other words, “[t]his Court shall not disturb a trial court’s decision unless it is clearly wrong.”
 
 Id.
 

 ¶ 14. We are also mindful that a party may not raise an issue that was not first presented to the trial court. M.R.E. 103(a)(1). Because Parker objected to Debbie’s testimony solely on the basis that it was irrelevant, he is restricted to that argument on appeal.
 
 [1]
 

 ¶ 15. “ ‘Relevant Evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” M.R.E. 401. “All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, the Constitution of the State of Mississippi, or by [the Mississippi Rules of Evidence].” M.R.E. 402. “Evidence which is not relevant is not admissible.”
 
 Id.
 

 ¶ 16. According to Debbie’s testimony, on the same day that someone killed Tim, Parker told Debbie, who had been dating Tim, that he would kill any man she dated. Debbie’s testimony tended to reveal Parker’s state-of-mind and his motive. Without question, Debbie’s testimony tended to make it more probable that Parker killed Tim. Accordingly, Debbie’s testimony was relevant. Accordingly, we must conclude that the circuit court did not abuse its discretion when it allowed Debbie to testify as to the statement at issue.
 

 II. DISCOVERY VIOLATION
 

 ¶ 17. The prosecution called Rhonda Lindsey during its case-in-chief. Rhonda was one of Tim’s neighbors. She testified that she saw a brown van parked at Tim’s house during the early morning hours of June 21st. Brenda had previously testified that she and Parker rode around in his “brown-looking” van.
 

 
 *706
 
 ¶ 18. Rhonda gave a statement to investigators on June 28, 2005. On direct examination, the prosecution asked Rhonda whether any details had been omitted from her June 28th statement. Rhonda initially replied, “[n]o, sir.” However, after she refreshed her memory by reviewing her statement, Rhonda replied, “|j]ust about hearing a gunshot.” The prosecution then concluded its examination, and the circuit court excused Rhonda after Parker’s attorney cross-examined her. The prosecution called one more witness that afternoon. Afterwards, the circuit court recessed for the day.
 

 ¶ 19. The next morning, Parker’s attorney moved for a mistrial and stated as follows:
 

 During the testimony — first, to lay the background, Your Honor, we, of course, filed for discovery in this case. Like you typically do, received [sic] voluminous documents, statements of witnesses, the synopsis of Beckner, which the Court is well aware, we cross-examined him on that. And one of the statements we received was the statement from Rhonda Lindsey, and Ms. Lindsey was offered as a witness yesterday by the State, and testified basically that she saw a van that looked like the van in the picture, that’s Mr. Parker’s van, in the driveway of [Tim’s] residence. She didn’t remember the day or the time.
 

 If you remember, [Investigator] Beck-ner testified that she offered additional information and said that she thought it was earlier in the week, last week, was probably — may have been Tuesday ... and may have been around 11:00 a.m. [the prosecutor] was asking her some questions in follow-up on that, and if I may approach the court reporter to read exactly what was — what transpired.
 

 (Reading from the court reporter’s computer screen.)
 

 [[Image here]]
 

 [The prosecutor] asked this question: Okay. Ace there details that you talked about today that were — are not in that statement that you told the officers about back on the 28th day of June of 2005? Her answer, just about hearing a gunshot, whereupon [the prosecutor] made no further inquiry about the gunshot. On cross-examination I certainly didn’t, because I had no idea, had no notice about this woman ever having told anybody that she had heard a gunshot.
 

 And again, we have received no indication at all that this lady was going to testify about having heard a gunshot.
 

 [The prosecutor] certainly may not have intended to elicit that, but that begs the question that we, as attorneys for the defendant, are entitled to all information relative to their case, which would include exculpatory information, and the question was asked specifically, during your conversation with the officers on June 28th of 2005. So obviously, this lady remembers telling [Investigator] Beckner, who took the statement on June 28th of 2005, that she heard a gunshot.
 

 Now, it’s my understanding, from talking with [the prosecutor] about this matter, that he has indicated that he was aware that the lady had heard gunshots, indicated there were — -it was really nothing unusual about it out there at that time.
 

 But what is important, Your Honor, is that the information this woman testified to, about a van looking like my client’s being in the driveway of the deceased around the time that they are saying he was killed, but that the gunshots that she was talking about were not heard at that time. It is my understanding that
 
 *707
 
 she never gave anybody indication she heard gunshots at that time.
 

 Therefore, information about other gunshots, when my client’s van is not there, would be exculpatory, and we are entitled to have that information, and so we submit to you, Your Honor, that by not getting this information properly and timely and getting information that is exculpatory to our client’s case, warrants a mistrial, and we are moving for a mistrial at this time.
 

 ¶ 20. The prosecutor responded and stated that he spoke with Rhonda the night before she testified, and she did not discuss any gunshots. However, the prosecutor also stated that “over two weeks” prior to the trial, Rhonda mentioned “something about gunshots.” The prosecutor elaborated that Rhonda “said she lived in a rural area ... [and] that there were people who shot guns there all the time.” The prosecutor added that he “did not see it as any way relevant to what [he] was going to have her testify to regarding the van, and therefore [he] didn’t see anything to it.” Finally, the prosecutor argued that a mistrial was inappropriate because he had provided discovery to Parker’s attorney, including Rhonda’s status as a potential witness. Additionally, the prosecutor provided Parker’s attorney with Rhonda’s statement. Finally, the prosecutor noted that Parker’s attorney “had an opportunity to talk with [Rhonda] and gather any other information that may be pertinent to the van or anything else.”
 

 ¶ 21. Parker’s attorney replied that “to expect the defense counsel to ask a witness a question on information that is a surprise in open court is absurd.” Parker’s attorney then stated that he did not find out that Rhonda’s statement was exculpatory until after he talked with the prosecutor. Finally, Parker’s attorney commented as follows:
 

 As far as the timeliness of it, again I am in a catch 22. Am I going — you know, I don’t know what the woman is talking about, because nobody has said anything to me about it, and I’m going to go into that in front of the jury? So, you know, I was shocked, to say the least. That’s why we have discovery, to avoid shock and surprise, and to expect me to be able to — [overcome] that and say — I didn’t timely object to it I think is also absurd.
 

 ¶ 22. The circuit court took Parker’s motion into consideration, but the court never specifically ruled upon it. After the prosecution called an expert in firearms, the prosecution recalled Rhonda. The prosecution questioned Rhonda, and Parker’s attorney cross-examined her. During Rhonda’s recall testimony, Rhonda clarified that there was no relationship between the gunshots she heard and the van that she saw at Tim’s house.
 

 ¶ 23. On appeal, Parker argues that the circuit court erred when it denied his motion for a mistrial. According to Parker, “recalling ... [Rhonda] did not cure the obvious detriment to [him] in the preparation of his case and had [he] been aware of the true substance of the statements made by [Rhonda], more investigation would have been warranted into her knowledge about gunshots in the area and when.” We are mindful that “[t]he authority to declare a mistrial is left largely to the sound discretion of the trial judge.”
 
 Williams v. State,
 
 854 So.2d 1077, 1080(¶ 10) (Miss.Ct.App.2003). However, because Parker did not request a continuance or move for a mistrial when Rhonda gave the testimony at issue, Parker is
 
 *708
 
 barred from raising this issue on appeal.
 
 [2]
 
 “If a defendant who has been surprised by undisclosed discoverable evidence does not request a continuance at the time of such surprise, he waives this issue on appeal.”
 
 Hughery v. State,
 
 799 So.2d 105, 116(1112) (Miss.Ct.App.2001).
 

 ¶ 24. Procedural bar notwithstanding, we find no merit to Parker’s arguments. After Parker moved for a mistrial, the prosecution recalled Rhonda. During Rhonda’s recall testimony, both the prosecution and Parker’s attorney elicited testimony from Rhonda. That testimony clearly demonstrated the potential exculpatory nature of Rhonda’s testimony. Accordingly, Parker’s attorney was able to elicit exactly the testimony that he claimed was precluded by the prosecution’s alleged untimely disclosure. It follows that we find no merit to this issue.
 

 III. SUFFICIENCY OF THE EVIDENCE
 

 ¶ 25. Parker claims the circuit court should have granted his motion for a JNOV. A motion for a JNOV challenges the legal sufficiency of the evidence.
 
 Terrell,
 
 952 So.2d at 1004(¶ 23). “Appellate review is limited to whether the evidence shows beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed, and where the evidence fails to meet this test it is insufficient to support a conviction.”
 
 Id.
 
 “After viewing the evidence in the light most favorable to the State, the evidence is sufficient if any rational trier of fact could have found the defendant committed each element of the crime beyond a reasonable doubt.”
 
 Id.
 

 ¶ 26. This is a circumstantial-evidence case.
 
 [3]
 
 “[A] circumstantial[-]evidence case is one in which there is neither an eyewitness nor a confession to the crime.”
 
 Stephens v. State,
 
 911 So.2d 424, 437(¶ 43) (Miss.2005). “Circumstantial evidence need not exclude every possible doubt, but only every other reasonable hypothesis of innocence.”
 
 Id.
 
 (internal quotations omitted).
 

 ¶ 27. The jury found Parker guilty of murder in violation of Mississippi Code Annotated section 97 — 3—19(l)(a) (Rev. 2006). Pursuant to section 97~3-19(l)(a), a person is guilty of murder when he or she kills someone “with deliberate design to effect the death of the person killed, or of any human being.”
 
 Id.
 
 Viewed in the light most favorable to the State, the jury heard the following evidence: (1) Brenda showed Parker where Tim lived at approximately 12:45 a.m. on Tuesday, June 21, 2005; (2) Parker later told Brenda that she better not tell anyone that she had showed him where Tim lived; (3) Parker was furious when he saw that Debbie was at Tim’s house; (4) Debbie noticed that someone in a van similar to Parker’s drove by Tim’s house; (5) Parker dropped Brenda off at approximately 1:00 a.m.; (6) Tim was last seen alive at approximately 2:00 a.m.; (7) Brenda tried to call Parker at approximately 3:00 a.m., but he was not at his home; and (8) Tim’s neighbor, Rhonda, noticed that a van similar to Parker’s was
 
 *709
 
 parked in Tim’s driveway early Tuesday morning.
 

 ¶ 28. Parker’s son, John, lived with Parker during June 2005. According to John, he arrived home at approximately 10:00 p.m. on June 20th. John testified that Parker was not there. John also testified that Parker’s vehicle was not there. John went on to testify that Parker did not come home until sometime between 10:00 a.m. and noon on June 21st. When John asked Parker where he had been, Parker did not answer. John testified that Parker was angry because Debbie had his car. According to John, Parker said Debbie used “his ear to drive around and F everybody.” As previously mentioned, when Parker picked up his car from Debbie, Parker reminded Debbie “that if he caught [her] with anyone that — that he would kill them, that he would kill [her], and the very last thing he said to [her] before he left is, T told you what I would do if I caught you with another man.’” Finally, John testified that Parker sent him a letter. In that letter, Parker told John to tell the authorities that Parker traded his nine-millimeter pistol for a hunting rifle. Tim died due to a gunshot wound from a nine-millimeter pistol.
 

 ¶ 29. Parker claims that Debbie’s testimony was “riddled with inconsistencies, falsehoods^] and contradictions to such an extent that it is not worthy of belief.” According to Parker, Debbie was not a credible witness because: (1) Debbie was a convicted felon; (2) she gave three different times at which she left Tim’s house in the early morning hours of June 21, 2005; (3) she was an admitted drug user; (4) she lied about where she went after she left Tim’s house; and (5) she had a motive to incriminate Parker because she faced criminal liability for action she took regarding Parker’s vehicle titles. However, witness credibility is irrelevant to our present analysis because “[m]atters regarding the credibility and weight to be accorded the evidence are to be resolved by the jury.”
 
 Terrell,
 
 952 So.2d at 1003(¶ 20). In other words, “[t]his Court does not have the task of re-weighing the facts in each case to, in effect, go behind the jury to detect whether the testimony and evidence they chose to believe was or was not the most credible.”
 
 Id.
 
 at 1003(¶ 22). Considering the evidence in the light most favorable to the State, we must conclude that a rational trier of fact could have found that Parker was guilty of murdering Tim. Accordingly, we find no merit to this issue.
 

 IV. WEIGHT OF THE EVIDENCE
 

 ¶ 30. In his final issue, Parker claims the circuit court erred when it denied his motion for a new trial. “A motion for a new trial seeks to vacate the judgment on grounds related to the weight, not sufficiency, of the evidence.”
 
 Id.
 
 at 1002(¶ 16). “We may only reverse the circuit court’s decision if we are convinced that the circuit court abused its discretion when it overruled the defendant’s motion for a new trial.”
 
 Id.
 
 at 1002-03(¶ 16).
 

 ¶ 31. Parker reiterates his arguments under the previous issue. For all of the reasons we discussed above, we cannot conclude that the circuit court abused its discretion when it overruled Parker’s motion for a new trial. Therefore, we find no merit to this issue.
 

 ¶ 32. THE JUDGMENT OF THE AL-CORN COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 
 *710
 
 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . The record indicates that there was a bench conference after Parker’s attorney objected. However, that bench conference went unrecorded and any discussion that transpired during that bench conference is omitted from the record. We make no assumptions regarding the events that took place during that bench conference.
 

 [2]
 

 . A motion for a mistrial is a sufficient request for a continuance.
 
 Snelson v. State,
 
 704 So.2d 452, 458(¶ 35) (Miss.1997).
 

 [3]
 

 . Jmy instruction C-4 stated that the prosecution could prove its case by direct or circumstantial evidence or both. Additionally, instruction C-4 informed the jury that ”[c]ir-cumstantial or indirect evidence is that which tends to establish a disputed fact by proving another, and which, through time, does not [in and] of itself conclusively establish that fact but which affords an inference or presumption of its existence.”