997 So.2d 953 (2008)
James Arthur FANNINGS, Jr., Appellant
v.
STATE of Mississippi, Appellee.
No. 2007-KA-00112-COA.
Court of Appeals of Mississippi.
December 16, 2008.
*955 Johnnie E. Walls, Jr., Greenville, attorney for appellant.
Office of the Attorney General by Deirdre McCrory, Jackson, attorney for appellee.
Before MYERS, P.J., GRIFFIS, BARNES and ISHEE, JJ.
BARNES, J., for the Court.
¶ 1. A Bolivar County jury found James Arthur Fannings, Jr., guilty of murdering his girlfriend, Stacey Hazelton (Stacey). The trial judge sentenced Fannings to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole. Fannings now appeals, raising six issues: (1) whether the trial court erred in failing to grant a judgment notwithstanding the verdict (JNOV) due to the insufficiency of the evidence to support the charge of murder; (2) whether the trial court erred in not granting a JNOV due to the sufficiency of the evidence to support only the charge of manslaughter; (3) whether the trial court failed to advise him of his right to testify; (4) whether he received ineffective assistance of counsel; (5) whether he was improperly sentenced; and (6) whether the cumulative effect of these errors warrants reversal. Finding no error, we affirm Fannings's conviction and sentence.

SUMMARY OF FACTS AND PROCEDURAL HISTORY
¶ 2. In April 2004, Stacey drove from Lancaster, Pennsylvania to Alligator, Mississippi with her boyfriend, Fannings (a/k/a "Beans" or "J"), and his friend, Chavon Mack (a/k/a "Pierre" or "P"). They rode in Stacey's teal-green 1996 Chevrolet Blazer, which her father had given her. Stacey was approximately twenty-one years old at the time and was a life-long resident of Pennsylvania. Stacey's mother, Natalie Hazelton, testified that Stacey was a hard worker, and before coming to Mississippi, she had worked two jobs in Pennsylvania: one at a restaurant and another at a gas station. It is at the gas station that Stacey met Fannings, who also worked there. Mrs. Hazelton testified that Stacey had mentioned Fannings, but Mrs. Hazelton had never actually met him. She remarked, however, that "[h]e wasn't that good for [Stacey]."
¶ 3. In April 2004, Stacey had been living at home with her parents when she informed them that she had decided to go to Mississippi to "start over." She did not mention to them with whom she would be traveling. Her parents were concerned with her decision, but Stacey agreed to keep in touch. Mrs. Hazelton testified *956 that, for the next few weeks, Stacey called from Mississippi and talked to her mother by cellular phone three to four times a day.
¶ 4. When Stacey, Fannings, and Mack first arrived in Alligator, Mississippi, they stayed for approximately two and one-half weeks in the three-bedroom apartment of Rochelle Williams (a/k/a "Big Mama"), where her daughter, Telisia (a/k/a "Tee-Tee"), and two other people resided; then the trio moved to a trailer in nearby Duncan, Mississippi. In late April 2004, Stacey drove back to Lancaster to retrieve some personal items from her parents' home such as clothing, a sewing machine, her bicycle, and a Play Station 2 video console. Before Stacey's return to Mississippi, her mother testified that Stacey appeared upset and acted "like she didn't want to go." Her parents reassured her that she could stay at home, but she decided to leave anyway. Her parents gave her a hug and told her they loved her. They also gave her $500 for gas and food. This was the last time Stacey's parents saw her.
¶ 5. On May 21, 2004, Stacey talked to her mother on the telephone, crying. She said she wanted to come home. Her parents offered to come get her from Mississippi, but Stacey said she would make the drive to Pennsylvania after her Blazer was repaired. Her parents wired her $400 to the Wal-Mart in Cleveland, Mississippi for the repairs and gas. The plan was for Stacey to repair her vehicle and come home to Pennsylvania. However, after this date, Stacey's telephone calls to her parents ceased. Also, sometime in May, worried about not hearing from Stacey, her mother contacted the Bolivar County Sheriff's Department, and Officer Charles Griffin conducted a "welfare check" on Stacey to find out how she was doing. Stacey was found to be still living at the apartment in Alligator.[1] In January 2005, having not heard from Stacey over the holidays, her parents filed a missing person's report with Pennsylvania law enforcement.
¶ 6. In June 2005, Corporal Patrick Quigley, of the Pennsylvania State Police, took over the investigation of Stacey's disappearance. Corporal Quigley determined that Fannings was her boyfriend and interviewed him for the first time.[2] At this point, no foul play was suspected. Fannings told Corporal Quigley that he met Stacey when they worked at a gas station together. Fannings explained they had been dating about seven months when Stacey became pregnant, and when Stacey's parents were told, they "flipped out"; so Stacey and Fannings came to Mississippi. Fannings said the last time he saw Stacey or her Blazer was about four weeks after they had arrived in Mississippi, in April 2004, at which time she had decided to drive back to Pennsylvania in her Blazer with Mack.
¶ 7. In September 2005, Corporal Quigley found Stacey's Blazer in a Pennsylvania impound lot, where it had been towed on June 9, 2004.[3] An investigation of Lancaster police records showed the vehicle had been stopped by law enforcement on *957 June 8, 2004, in Lancaster, in connection with a complaint by a man named Frank Grubbs. Grubbs was interviewed by law enforcement and testified at trial that Fannings, an acquaintance, had stopped by his house in June 2004 in Lancaster County. Grubbs testified Fannings was driving a teal-green Blazer. Another man was with him, and they stole Grubbs's motorcycle. This testimony directly conflicts with Fannings's statement that the last time he saw Stacey's Blazer was in April 2004 in Mississippi.
¶ 8. In the course of investigating Stacey's whereabouts, Corporal Quigley spoke with numerous witnesses, and he determined that none of Stacey's friends or family had heard from her since May 2004. A credit history check on Stacey showed the only recent activity was in January 2005 when her cellular phone bill had gone to a collection agency. Continuing his investigation of Stacey's disappearance with the Bolivar County Sheriff's Department and Officer Griffin, Corporal Quigley traveled to Mississippi, where he interviewed Rochelle and her daughter Telisia, who had lived near Fannings in Pennsylvania at one time. Rochelle gave Corporal Quigley Stacey's sewing machine; however, he was unable to locate any other belongings of Stacey's, including her clothing or the Play Station 2.
¶ 9. A break in the case occurred in October 2005, when Corporal Quigley interviewed Mack for the first time. Allegedly, he was the last person to have seen Stacey, having left Mississippi for Pennsylvania with her in May 2004, according to Fannings's statement. At this interview, Mack provided information which led to Fannings's arrest. Fannings was subsequently incarcerated in a Lancaster County, Pennsylvania prison.
¶ 10. On January 18, 2006, Fannings waived his Miranda rights and gave a second statement to Corporal Quigley from the Lancaster prison, a transcription of which was entered into evidence at trial. At this time Fannings stated the last time he saw Stacey was around May 20, 2004, when he dropped her off at the bus station in Cleveland, Mississippi, for Pennsylvania. However, this statement conflicts with prior and subsequent statements.[4] Fannings stated he went with Mack to a pawn shop on May 24, 2004, to pawn some of his jewelry, which the dealer would not take, and to pawn a Play Station 2, which he stated was also his.[5] Mack had to sign the ticket at the pawn shop as Fannings did not have identification. Fannings said he was in Mississippi for two or three more months before he drove back to Pennsylvania in Stacey's Blazer. Fannings claimed Stacey did not accompany him as she was already in Pennsylvania. He stated the last time he drove or saw her Blazer in Pennsylvania was when he was stopped by the police in Lancaster for a noise ordinance and was taken to the station. After he was released, he stated the vehicle was gone from the impound lot. Fannings thought Stacey was currently residing in Reading, Pennsylvania.[6] Finally, he denied ever abusing or killing Stacey.
*958 ¶ 11. While Fannings was incarcerated in Pennsylvania, a fellow prisoner, Shannon Robinson, came forward with information about Stacey's disappearance. Corporal Quigley spoke with Robinson, who stated that Fannings, who was in his same cell block, told him that he had "killed a female" in Mississippi. Robinson, unbeknownst to Fannings, was also Mack's friend. Robinson stated that Fannings wanted Mack harmed. Fannings had told Robinson he "was going to beat the case because they ain't got nothing but ... an old bloody sheet and they ain't got no weapon. All they got is Pierre [Mack] ... and I got to get after him."
¶ 12. In June 2006, Fannings requested a preliminary hearing in Bolivar County, and for the first time, information that Stacey was possibly dead came forward. Mack testified at the hearing that he was present when Stacey's remains were buried.[7] Mack took Officer Griffin and other officers to the apartment in Alligator, where he claimed Stacey was murdered. Then, he took authorities to an area west of Duncan  the Hushpuckena Creek  where Stacey's remains were supposedly buried. However, after digging for quite some time, the search party only retrieved a small bone, which was later determined to be nonhuman.[8]
¶ 13. On September 19, 2006, a Bolivar County grand jury indicted Fannings for Stacey's murder on or about May 24, 2004, pursuant to Mississippi Code Annotated section 97-3-19 (Rev.2006). In October 2006, a prisoner housed in the same Cleveland correctional facility as Fannings, DeWayne Hollingsworth, notified authorities that he had information about Stacey; therefore, Officer Griffin interviewed him. Hollingsworth, who had not known Fannings before, and who was incarcerated for a burglary charge, testified that Fannings admitted to him that he had shot Stacey in the head and buried her in the Duncan area. Fannings told Hollingsworth that a friend of his (presumably Mack) was also involved, and that friend had "snitched" on him. Fannings made several "sly remarks" to Hollingsworth about the burial of Stacey's body after viewing ongoing television news reports about it. As the search for Stacey's remains continued, Fannings would ask Hollingsworth if the search was having any success, as Hollingsworth knew and was housed with several of the inmates that participated in the search. When Fannings inquired of Hollingsworth about what type of body parts the search party had found, Hollingsworth replied, "maybe a finger bone." Hollingsworth then said Fannings commented that that was "impossible," as "we burned her fingers up too good for 'em to find any finger bones or anything like that." Shortly after making his statement to Officer Griffin, Hollingsworth was moved by prison authorities to another correctional facility because of threats against him made by Fannings.
¶ 14. On November 27, 2006, Fannings's three-day trial began. Nine witnesses testified for the prosecution. Many of the witnesses were subpoenaed to appear. As the witnesses testified, numerous inconsistencies began to emerge regarding the various statements Fannings had given. Stacey's mother testified that *959 she had never spoken with or met Fannings, nor had he ever visited them, which is contrary to his statement to Corporal Quigley that he had gone to the Hazelton's house at one time and Stacey's father physically chased him off with a shotgun. Moreover, he did not notify Stacey's parents that he had Stacey's Blazer.
¶ 15. Most damning to the defense was Mack's testimony. He testified he had known Fannings since junior high school. Fannings had more than five other girlfriends while he was dating Stacey. Mack described Fannings's behavior toward these women, and Stacey in particular, as mean and manipulative. Mack explained that he, Fannings, and Stacey came to Mississippi to "start over." Mack described the relationship between Stacey and Fannings as abusive, and they fought almost daily. A few times Fannings hit Stacey and left bruises. Also, according to Mack, on two occasions Fannings locked Stacey in a bedroom at Rochelle's apartment all day, where she sat and cried, only to be let out to go to the bathroom. At one point, while at the trailer, Fannings threw out Stacey's clothes after an argument, and she had to wear the same set of clothes for five days.
¶ 16. The last day Mack stated he saw Stacey, the three of them were at Rochelle's apartment in Alligator in a back bedroom. Nobody else was present. Fannings and Stacey were arguing. Fannings was playing with his gun, "pointing it at himself and then pointing it at her and talking to her." Mack described what happened next:
[H]e was talking about how that he wanted to have more than one chick and that, she said that ... she wasn't for it and she wanted to leave. And after that he said, well, if I can't have anybody else, then I might as well kill myself. And she said, no, kill me. And at that time, before she said that, I turned around and he shot her. And she fell face down.
Mack clarified that Fannings put the gun right up next to Stacey's head before he shot her. Fannings then threatened to kill Mack if he did not help dispose of Stacey's body.
¶ 17. Mack also related the details regarding the disposal of Stacey's body. First, Fannings told Mack to find something to put her body in; so Mack wrapped her in some sheets and found a large plastic container, while Fannings cleaned blood from the apartment floor with detergent.[9] After hoisting the container through a back window of the apartment and into the back of Stacey's vehicle, Mack and Fannings drove to the trailer in Duncan. Stacey's body was left in the plastic container in the back of the Blazer for two days, as Fannings tried to determine what to do with it. Fannings and Mack drove around intermittently. During this time, they were actually pulled over in Stacey's vehicle by Officer Griffin while Stacey's body was in the Blazer. Mack claims, however, he did not offer information about Stacey to Officer Griffin then because he "was scared" of Fannings, who still had a gun in his possession.
¶ 18. Two days after the murder, Fannings and Mack drove to a farm near Duncan. They placed Stacey's body in a metal barrel and burned it overnight for seven hours, until there was nothing left but "parts." Mack placed Stacey's remains in a bag, and upon Fannings's orders, he dug a hole, placed the remains in it, and covered it. Mack claimed the burial site was down the road from where they *960 had burned Stacey's body, in the woods. Fannings instructed Mack that if anybody asked where Stacey was to reply that she had left "and he sent her bags on a little train back home."
¶ 19. Several days later, Mack and Fannings left for Pennsylvania in Stacey's Blazer with Telisia, Rochelle's daughter. During the trip, Fannings again threatened to kill Mack, as well as his father and son, if Mack told anybody about the murder. Mack also related an altercation between Telisia and Fannings in the vehicle when they were still in north Mississippi, which began as flirting and escalated into threats of violence. Then, when Telisia cut Fannings with a knife, Mack pulled the vehicle over, and Telisia got out of the Blazer. She walked down the road, leaving her belongings behind in the truck.
¶ 20. Mack testified that when law enforcement came to talk to him in Pennsylvania about another incident, he told them about the shooting in Mississippi. Mack stated he did not tell anybody for over a year about the murder because he feared for his family. Corporal Quigley testified that he also feared Mack may be harmed by Fannings. At trial, Mack admitted that when he was relating the murder at the preliminary hearing, he failed to mention that he had helped burn and bury Stacey's body. During cross-examination, Mack could not explain why Stacey's remains had not been recovered, as he insisted he took the authorities to the exact site of her burial.
¶ 21. Telisia Williams's testimony also implicated Fannings in Stacey's murder. She had formerly lived in Lancaster, Pennsylvania, and she had known Fannings for several years. She also lived in the apartment with Rochelle, Fannings, Mack, and Stacey when they arrived in Mississippi. She confirmed Fannings's relationship with Stacey could be abusive, testifying to several incidents where Fannings hit, dragged, or choked Stacey, as well as an incident where Fannings shot some bottles out of Stacey's hand with a gun. Shortly after Stacey's disappearance, Telisia testified that Fannings and Mack told her they had taken Stacey to a bus station. However, at one point, Mack told her Stacey was dead, but Telisia was unsure if he was kidding or not. On the stand, Telisia was a reluctant witness, and she initially denied having told law enforcement that, while driving to Pennsylvania, she asked Fannings about Stacey's whereabouts, and he responded, "we killed that b* * * *; now shut the f* * * up." Telisia insisted that Fannings was just trying to silence her questions, and he did not really mean what he said. Telisia also confirmed the altercation with Fannings on the way to Pennsylvania where she claimed she jumped out of Stacey's vehicle to escape Fannings's choking her after she cut him.
¶ 22. The last witness testifying for the prosecution was Casey Smith LeGier, one of Fannings's former girlfriends in Pennsylvania. She testified that "unfortunately" she had dated Fannings in early 2004. LeGier, who knew Stacey and knew that Fannings had been dating her, noticed that Fannings was driving Stacey's teal-green Blazer upon his return to Pennsylvania from Mississippi. Fannings explained to LeGier that Stacey was letting him drive the Blazer as Stacey was in Italy for a school trip. Fannings also asked LeGier to get Stacey's vehicle out of the impound lot by calling and pretending to be Stacey. Fannings showed LeGier Stacey's driver's license, and he told her she would be able to retrieve the vehicle with it. Finally, LeGier testified that Fannings was emotionally abusive, and she had miscarried his child after he had returned to Pennsylvania.
*961 ¶ 23. After this testimony, the State rested, and the trial judge denied the defense's motion for a directed verdict. Being thoroughly informed of his right to testify in his own defense by both counsel and the trial judge, Fannings decided not to testify. The defense made a strategic decision not to call any other witnesses. After closing arguments, the jury began its deliberations and quickly returned a verdict of guilty of murder. The trial judge sentenced Fannings to life imprisonment in the custody of the MDOC without eligibility for parole. Fannings filed a motion for a new trial, which was denied.

ANALYSIS OF THE ISSUES
¶ 24. Fannings raises six issues; however, we will combine his first two issues dealing with the sufficiency of the evidence, as they overlap.

1. Whether the verdict was against the sufficiency and weight of the evidence.[10]
¶ 25. Fannings argues that the trial court erred in failing to grant a motion for a JNOV for the conviction of murder because the evidence was insufficient or, alternatively, that the evidence could have only supported a verdict of manslaughter.
¶ 26. A directed verdict and a motion for a JNOV both challenge the sufficiency of the evidence. McClain v. State, 625 So.2d 774, 778 (Miss.1993). The standard of review is the same for both. "The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence." Id. (citation omitted). All credible evidence consistent with the defendant's guilt will be accepted as true. Id. (citing Spikes v. State, 302 So.2d 250, 251 (Miss.1974)). "[R]eversal can only occur when evidence of one or more of the elements of the charged offense is such that `reasonable and fair minded jurors could only find the accused not guilty.'" Hawthorne v. State, 835 So.2d 14, 21(¶ 31) (Miss.2003) (citation omitted).
¶ 27. Alternatively, a motion for a new trial challenges the weight of the evidence. Smith v. State, 802 So.2d 82, 85-86(¶ 11) (Miss.2001) (citations omitted). This Court reviews a motion for a new trial under an abuse of discretion standard. Johnson v. State, 904 So.2d 162, 167(¶ 11) (Miss.2005) (citations omitted). In determining whether a jury's verdict is against the overwhelming weight of the evidence, this Court will "only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." Bush v. State, 895 So.2d 836, 844(¶ 18) (Miss.2005) (citations omitted). Evidence will be reviewed in the light most favorable to the verdict. Id.
¶ 28. Fannings claims a missing person's investigation turned into a murder case because of the statements of an untrustworthy accomplice, Mack, whose testimony at trial that Fannings murdered Stacey was unreliable and uncorroborated, except by two jailhouse informants, Hollingsworth and Robinson. Fannings goes on to argue that no "deliberate design" was established pursuant to the statute under which Fannings was indicted, section 97-3-19(1)(a), which defines murder as "[t]he killing of a human being without the authority of law by any means or in any manner ... [w]hen done with deliberate design to effect the death of the person killed...." Fannings also devotes a separate issue to the argument that there *962 could only be sufficient evidence for a conviction of the lesser-included offense of manslaughter, which is defined as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense...." Miss.Code Ann. § 97-3-35 (Rev.2006). Furthermore, Fannings asserts that the State cannot even produce any credible, sufficient evidence that a killing even occurred because Stacey's body was never located; thus, no corpus delicti was established.
¶ 29. Considering the evidence in the light most favorable to the State, we find that there is sufficient evidence to support Fannings's conviction of murder. Mack, the only eyewitness to the incident, testified that Fannings deliberately shot Stacey in the head at point-blank range. We note "deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent." Brown v. State, 965 So.2d 1023, 1030(¶ 28) (Miss.2007) (quoting Gossett v. State, 660 So.2d 1285, 1293 (Miss.1995)). Additionally, the Mississippi Supreme Court has recognized that shooting a victim with a gun constitutes deliberate-design murder, as "deliberate-design connotes an intent to kill," and an inference of intent to kill is raised "through the intentional use of any instrument which, based on its manner of use, is calculated to produce death or serious bodily injury." Brown, 965 So.2d at 1030(¶ 28); Jones v. State, 710 So.2d 870, 878(¶ 35) (Miss.1998). While the jury was given the option of convicting Fannings of manslaughter or murder, it found evidence beyond a reasonable doubt for murder. "Whether a homicide is classified as a murder or manslaughter is ordinarily an inquiry to be made by the jury." Hodge v. State, 823 So.2d 1162, 1166(¶ 16) (Miss.2002). Mack recounted no "heat of passion" element present to forward a possible manslaughter conviction, and Fannings did not produce any evidence to this effect either. Even though Mack stated Fannings and Stacey were "arguing" at the time of the shooting, there was no evidence that this was an intense argument or that Stacey had provoked Fannings. The defendant was said to be "playing" with his gun, and then he pointed it directly at Stacey's head and pulled the trigger after she stated, "no, kill me."
¶ 30. Mack's testimony was corroborated by Hollingsworth and Robinson, who testified they were not offered any promises in exchange for their testimony against Fannings. Moreover, their testimony provided details that could only have been revealed to them by Fannings. As far as Mack being an unreliable witness, nobody testified to this effect, and while Mack admitted at trial that he did aid Fannings in disposing of Stacey's body, a fact he did not admit to earlier, he stated Fannings had threatened him unless he helped. Moreover, there was no evidence presented that Mack actually committed the murder; the defense did not provide a single witness to dispute the evidence of Fannings's guilt.
¶ 31. We find Fannings's argument regarding insufficiency of evidence to establish the corpus delicti to be without merit. The corpus delicti is defined as "the body or substance of the crime." Stephens v. State, 911 So.2d 424, 434(¶ 32) (Miss.2005) (quoting Parks v. State, 884 So.2d 738, 742(¶ 10) (Miss.2004)). Two elements must be proven beyond a reasonable doubt in order to establish the corpus delicti in a homicide case: (1) "the death of a human being" and (2) "a criminal agency causing that death." Hodge, 823 So.2d at 1165(¶ 11) (citing Nelson v. State, 722 *963 So.2d 656, 660(¶ 21) (Miss.1998)). While Stacey's remains were never recovered, there was uncontested evidence of the eyewitness, Mack, that Stacey had been killed when Fannings shot her in the head. Just because a body has not been recovered does not mean that there is no evidence of a death. A witness who sees the deceased shortly after his death and testifies the deceased is dead can establish evidence of a death. King v. State, 251 Miss. 161, 176, 168 So.2d 637, 643 (1964). Mack's testimony satisfies both elements of the corpus delicti.
¶ 32. As far as the weight of the evidence and whether or not Mack's testimony was reliable, "the jury is the final arbiter of a [witness's] credibility." Chambliss v. State, 919 So.2d 30, 35(¶ 16) (Miss.2005) (quoting Morgan v. State, 681 So.2d 82, 93 (Miss. 1996)). The jury may accept or reject the testimony of any witness. Id. (citing Pinson v. State, 518 So.2d 1220, 1224 (Miss.1988)). It is improper for this Court to determine whose testimony to believe. Id. Here, the jury chose to believe Mack's testimony regarding Stacey's death and the other witness's corroborating testimony.
¶ 33. We find the State proved all of the elements of deliberate-design murder sufficient to establish Fannings's guilty beyond a reasonable doubt. The trial court properly allowed the jury to decide whether the evidence established a conviction for murder or manslaughter. Finally, analyzing the evidence in the light most favorable to the verdict, we cannot find the trial court abused its discretion in denying the motion for a new trial.

2. Whether the trial court erred in failing to advise Fannings of his right to testify or not to testify.
¶ 34. Fannings claims that he was not advised of his right to testify or not, thereby violating his Fifth Amendment constitutional right against self-incrimination and his Mississippi constitutional rights pursuant to Article 3, Section 26 of the Mississippi Constitution of 1890, which gives the defendant the right to testify on his own behalf.[11] He cites to Culberson v. State, 412 So.2d 1184, 1186-87 (Miss.1982) for the proposition that the defendant should not be compelled to give evidence against himself, but if "he wants to testify he should be permitted to do so. A record should be made of this so that no question about defendant's waiver of his right to testify should ever arise in the future." Fannings contends the record is completely devoid of his Culberson warnings, nor was he advised of the possible "ill effects" of his testimony, or lack thereof.
¶ 35. We note that Fannings did not raise this issue before the trial court or in his post-trial motion. Failure to raise an issue before the trial court creates a procedural bar that prohibits review of the issue on appeal. Glasper v. State, 914 So.2d 708, 721(¶ 30) (Miss.2005) (citing Smith v. State, 729 So.2d 1191, 1201(¶ 38) (Miss.1998)). Accordingly, the issue is procedurally barred. However, procedural bar notwithstanding, we find Fannings has obviously misread the record; thus, this issue is entirely without merit. The following colloquy occurred between Fannings's *964 defense counsel, Stan Perkins, and the trial judge, after the State's case-in-chief concluded and the defendant's motion for a directed verdict was denied:
By the Court: Now, Mr. Perkins, let us move to the next juncture. Have you had an opportunity to confer with your client?
By Mr. Perkins: I have, Your Honor.
By the Court: Has he made a decision as to whether or not he's going to testify?
By Mr. Perkins: He has indicated to me that he chooses not to testify. If I may be so bold as to ask him if that's his own decision.
By the Court: Well, if you don't mind, I will.
By Mr. Perkins: Oh, yes, sir.
By the Court: Mr. Fannings, this case is between you and the State of Mississippi. You have a right to testify. You have a right not to testify. Should you choose to testify, you will be examined by your attorney or one of them and cross-examined by one of the State's prosecutors. You will be questioned just like other witness[es] have been questioned in this case.
Now, if you choose not to testify, the State cannot comment upon your not testifying. They can't say, for example, that you must be guilty because you didn't say anything to defend yourself. The law does not allow the prosecutors to say that.
Now, if you find it necessary to go out and talk with your attorneys again, you may. If you wish to remain steadfast in your decision not to testify, you may tell that now.
By Mr. Fannings: It's my understanding, Your Honor, that this case is based on the facts and evidence and the law so I do not wish to testify.
By the Court: Very well. That decision on your part will be accepted by the Court and will be respected by the attorneys.
(Emphasis added.) Fannings was clearly advised of his right to testify, or not, by both his defense counsel and the trial judge. Further, it is not required nor would it be possible for Fannings to be advised of the potential "ill effects" of his testimony, as Fannings argues, since this would be impossible to determine. Moreover, Culberson does not require trial judges to advise a defendant of his right to testify or not; it is merely a suggestion: "We suggest to the trial judges of the state that, in any case where a defendant does not testify, before the case is submitted to the jury, the defendant should be called before the court out of the presence of the jury, and advised of his right to testify." Culberson, 412 So.2d at 1186. See also Scott v. State, 965 So.2d 758, 763(¶ 25) (Miss.Ct.App.2007) (citing Shelton v. State, 445 So.2d 844, 847 (Miss. 1984)) (holding the trial court is not required to give Culberson warnings to defendant). Nonetheless, the trial court advised Fannings of this right. We do not find a violation of Fannings's United States or Mississippi constitutional right regarding whether to testify or not.

3. Whether the defendant received ineffective assistance of counsel.
¶ 36. Fannings contends he received ineffective assistance of his trial counsel, who was different from his counsel on appeal, because he states the jury deliberated approximately sixteen minutes before finding him guilty. Fannings gives no specifics, however, as to how trial counsel was ineffective, except to reiterate that defense counsel should have insisted on Culberson warnings, which were in fact given to the defendant. Fannings also complains that *965 he was tried less than three months after his indictment.[12]
¶ 37. While this Court is not prohibited from considering an ineffective counsel claim on direct appeal, appellate courts usually do not do so, because "we are limited to the trial court record in our review of the claim and there is usually insufficient evidence within the record to evaluate the claim." Wilcher v. State, 863 So.2d 776, 825 (¶ 171) (Miss.2003). This Court should only reach the merits of a claim for ineffective assistance of counsel on direct appeal if: "(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." Id. In the instant case, the parties have not entered into any such stipulation about the record, nor does the record show ineffectiveness of constitutional dimensions. We find, however, that we can dispose of the matters Fannings raises in his brief, as a review of the record clearly shows sufficient evidence that they lack merit.
¶ 38. As to the brief jury deliberations, Fannings does not elaborate about how this matter relates to an ineffective assistance of counsel claim. Our research shows this issue is usually raised as a separate issue, not as an ineffective counsel claim. At any rate, regarding jury deliberations, the supreme court has held that "there is no formula to determine how long a jury should deliberate." Smith v. State, 569 So.2d 1203, 1205 (Miss.1990) (citing Johnson v. State, 252 So.2d 221, 224 (Miss.1971)). Here, the jury recessed to deliberate at 5:15 p.m. At 5:20 p.m., the court was informed that the jury had arrived at a verdict, but it was in the wrong form, stating: "[W]e, the jury, find the defendant of murder." The trial judge, realizing the jury had made a decision, but just in the wrong form, sent the jury back to the jury room at 5:35 p.m. They returned to the jury box at 5:37 p.m., and the verdict, in the proper form, was read. We do not find that swift jury deliberations equate with ineffective assistance of counsel. A more probable explanation is that the overwhelming weight and sufficiency of the evidence against Fannings, not to mention the fact the defense did not call any witnesses to testify, paired with proper jury instructions, made the jury's decision clear. We find no grounds for error.
¶ 39. Regarding the Culberson warnings argument, we have already discussed its lack of merit in the previous issue. Fannings's right to testify was properly explained by both defense counsel and the trial judge. Finally, as far as the three-month time period from indictment to trial, we note that Fannings's first defense counsel filed a notice of demand for a speedy trial ten days after the indictment, on September 29, 2006, which would explain the prompt nature of the proceedings at the trial court level. This issue is without merit.

4. Whether the trial court erred in sentencing Fannings to life imprisonment without eligibility for parole for his conviction of murder.
¶ 40. Fannings argues that the trial court erred in sentencing him to life imprisonment without eligibility for parole for his conviction of murder. Fannings, however, does not give any reason why the trial court erred, except to state: "the trial court violated the murder statute in sentencing *966 the Appellant," thereby implying his sentence was illegal. Fannings's contention, however, is erroneous.
¶ 41. Fannings was indicted for deliberate-design murder under section 97-3-19 of the Mississippi Code. Upon being found guilty of this charge, the trial court sentenced him to life imprisonment, which "shall not be reduced or suspended, nor shall the defendant be eligible for parole or probation during the term of said sentence." The sentence imposed runs "consecutively to any and all sentences previously imposed."
¶ 42. It is well established that a sentence that does not exceed the maximum period usually will not be disturbed on appeal. Ford v. State, 975 So.2d 859, 869(¶ 39) (Miss.2008) (citation omitted). If a sentence is grossly disproportionate to the crime committed, we may, however, review it on Eighth Amendment grounds. Id. Regarding Fannings's sentence for murder, Mississippi Code Annotated section 97-3-21 (Rev.2006) reads that: "Every person who shall be convicted of murder shall be sentenced by the court to imprisonment for life in the State Penitentiary." However, this provision must be read in relation to other provisions that explain which classes of crimes allow for the possibility of parole. Booker v. Bailey, 839 So.2d 611, 612(¶ 6) (Miss.App.Ct.2003). Mississippi Code Annotated section 47-7-3(1)(g) (Supp.2006) explains that a person shall not be eligible for parole if he is convicted of a violent crime after June 30, 1995.[13] Fannings was convicted of the violent crime of murder after January 1, 2000; therefore, he is not eligible for parole according to section 47-7-3(1)(g).[14] Nor do we find this sentence to be grossly disproportionate to the crime committed. Accordingly, the trial judge did not err in sentencing Fannings to life imprisonment without eligibility for parole.

5. Whether Fannings suffered cumulative error.
¶ 43. Fannings argues that the overall failure of his defense counsel to develop the testimony of the witnesses and other claims of ineffectiveness support a cumulative error claim. This Court has the discretion to determine on a case-by-case basis when individual errors, while not reversible in themselves, are considered cumulatively, they may warrant reversal based on their cumulative prejudicial effect. Byrom v. State, 863 So.2d 836, 847(¶ 13) (Miss.2003). However, we find no error here; thus, this issue is without merit.

CONCLUSION
¶ 44. Based on the foregoing, we find no reversible error. Accordingly, we affirm Fannings's conviction and sentence.
¶ 45. THE JUDGMENT OF THE CIRCUIT COURT OF BOLIVAR COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT ELIGIBILITY FOR PAROLE IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] Officer Griffin testified he did this "welfare check" on Stacey in May 2004, but he was not more specific on the date. It is unclear from the record whether this was before or after May 21, 2004.
[2] Fannings was not under arrest, or even a suspect at this time; so his rights were not read before his statement.
[3] Because Stacey's vehicle was towed to the impound lot six months before she was officially reported missing, the investigators could not readily connect Stacey's ownership of the vehicle with its whereabouts.
[4] Corporal Quigley noted that in an earlier, unwritten statement, Fannings had told law enforcement he had placed Stacey on a train, not a bus. Later, in yet another unwritten statement, he changed this statement and stated he put her on a bus after they went to a pawn shop together.
[5] During Mack's testimony, he confirmed that he signed the pawn ticket but claimed the Play Station 2 belonged to him, not Fannings.
[6] Corporal Quigley's subsequent investigation found no evidence Stacey had ever been seen or lived in Reading, Pennsylvania.
[7] Mack did not offer this information in his October 27, 2005, statement to authorities in Pennsylvania.
[8] Later, in October 2006, Officer Griffin again tried to locate Stacey's remains in the same vicinity; however, again, only nonhuman bones were retrieved. Corporal Quigley also testified that during the two and one-half year investigation, he had been to Mississippi three times; however, no murder weapon or remains had ever been found.
[9] Mack testified the amount of blood from the murder was minimal. An investigation of the apartment did not turn up any of Stacey's blood.
[10] In his brief, Fannings argues primarily over the sufficiency of the evidence, and not the weight of the evidence. However, since he does mention the weight of the evidence in his brief, we shall discuss both issues.
[11] Article 3, Section 26 of the Mississippi Constitution of 1890 provides in part:

In all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both, to demand the nature and cause of the accusation, to be confronted by the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and, in all prosecutions by indictment or information, a speedy and public trial by an impartial jury of the county where the offense was committed; and he shall not be compelled to give evidence against himself....
[12] Fannings also does not specify against which counsel below he is directing his claims. Initially, Mr. Raymond Wong was Fannings's defense attorney, but on November 2, 2006, Mr. Stan Perkins filed a notice of appearance in the circuit court. While Mr. Perkins was the "lead" counsel at trial, Mr. Wong was also present.
[13] This provision excepts first-time offenders convicted of a non violent crime after January 1, 2000, who meet certain requirements of the statute. Miss.Code Ann. § 47-7-3(1)(g).
[14] Additionally, Fannings was not a first-time offender, as the sentencing report states his life sentence is to run consecutively to previously imposed sentences.